# THE BELCHER SUGAR REFINING COMPANY v. THE ST. LOUIS GRAIN ELEVATOR COMPANY, *Appellant.*

1. **Public Wharf**: DIFFERENT USE: CITY. Where a city condemns property for wharf purposes, it cannot be appropriated to a different, or inconsistent, use. ( 82 Mo. 521, *affirmed.*)

2. ——— : ——— : ———. Nor can it be disposed of by the city for private purposes. ( *Ib.*)

3. ——— : ——— : WAREHOUSE : ELEVATOR. The maintenance of a warehouse on a wharf, to be used in connection with a grain elevator, is a use incident to a public wharf.

4. ——— : LEASE BY ST. LOUIS CITY FOR WAREHOUSE. The city of St. Louis, under its charter, has the right to make a lease, containing proper stipulations as to its termination, of a part of its wharf for the erection of such warehouse.

5. **Elevator**: REGULATION OF BY STATE. Where a grain elevator company has engaged to execute a public trust, it is subject to public regulations, and the state may make the same as to charges for storing and handling grain.

6. **St. Louis City**: CHARTER : UNPAVED WHARF, LEASE OF. The charter power of a city to lease portions of its "unpaved" wharf applies to any portion not paved in a manner suitable for receiving and discharging passengers and freight, and a part not used for that purpose, from which most of the macadam was washed away in 1873, and which has been used ever since as a scavenger dump, is not paved within the meaning of the charter.

7. **Corporation**: ULTRA VIRES. One whose rights are not invaded cannot complain that a corporation is acting *ultra vires.*

8. ——— : ———. The stockholders or state only can complain in such case.

*Appeal from St. Louis City Circuit Court.*—HON. W. H. HORNER, Judge.

REVERSED AND REMANDED.

Belcher Sugar Refining Co. v. St. L. Grain Elevator Co.

*James O. Broadhead* for appellant.

(1) The city of St. Louis had authority, under its charter, to make the lease set up by defendant in its amended answer, of the date of January 7, 1885. City Charter, art. 3, sec. 26, subdiv. 2; Cooley on Const. Lim. [2 Ed.] pp. 521–553; *Nurse v. Railroad,* 21 Ill. 522; *West v. Bancroft,* 32 Vt. 367; *Kelsey v. King,* 32 Barb. 410; *Railroad v. Applegate,* 8 Dana, 289; *St. Louis v. Elevator Co.,* 2 Dillon, 70; *Building Ass'n v. Telephone Co.,* 88 Mo. 369; Acts, 1863, Adjourned Session, p. 223; Gould on Waters, p. 214, sec. 118; *Munn v. Illinois,* 94 U. S. 113–151; *Ferry Co. v. Hankey,* 31 Md. 348; *Keokuk v. Packet Co.,* 32 Iowa, 80; *Railroad v. Ellerman,* 105 U. S. 166; *Barney v. Packet Co.,* 4 Dillon, 324. (2) The St. Louis Grain Elevator Company has full authority, under its charter, to accept the lease from the city of St. Louis. Acts, 1863, Adjourned Session, p. 223. But, if such act of acceptance is *ultra vires,* the plaintiff has no right to complain. *Railroad v. Ellerman,* 105 U. S. 174.

*S. P. Galt* for respondent.

(1) The premises in dispute in this case were not an "unpaved" portion of the wharf, and, therefore, could not be leased by the city to the defendant. Cooley on Const. Lim., p. 57; Smith on Stat. and Con. Const., secs. 478, 481; *The King v. The Inhabitants of Great Bently,* 10 Barn. & Cres. 520; *Walker v. Harris,* 20 Wend. 555; *Martin v. Hunter's Lessee,* 1 Wheat. 326; Webster's Dictionary; *Cannon v. New Orleans,* 20 Wall. 577; *Packet Co. v. St. Louis,* Rep. June 23, 1880, p. 803; *Schultz v. Railroad,* 36 Mo. 13; 2 Dillon on Mun. Corp. [3 Ed.] sec. 796, and note, where "paving" is discussed; *Burnham v. Chicago,* 24 Ill.

499. (2) *First.* The defendant is limited in its charter to acquiring but five hundred feet frontage on the river. As it has already acquired, and now occupies, the five hundred feet, it cannot acquire and occupy the premises in question, which would make its river frontage eight hundred feet. Defendant's Charter, sec. 3 ; *Beaty v. The Lessee of Knowler*, 4 Peters, 29 ; *Agar v. Canal Co.*, Cooper's Cases, 79. *Second.* Plaintiff being the owner of the fee, and having peculiar rights in the property, can raise the question of defendant's power to take plaintiff's land into its own possession. (3) Whether the premises in dispute were a paved or unpaved portion of the wharf, the lease of the city to the defendant and the defendant's proposed occupation of the premises are illegal : *First.* Because it is a diversion of the use in the property condemned and a violation of the trust assumed by the city. *Second.* It is placing an additional burden upon the property, the fee thereof being in the plaintiff, not contemplated in the condemnation proceedings. *Third.* It being an additional burden, if the proposed warehouse is considered for public use, it is taking and damaging the plaintiff's property without compensation, contrary to the common law and section 21, article 2, of the constitution of Missouri ; if considered for private use, it is in violation of section 20, same article. *Fourth.* It is a violation of the city's implied contract made with the plaintiff, when it paid to the city the twenty-three hundred and fifty dollars, as benefits to his property, that the city would hold the property strictly in accordance with the purposes expressed, and by which the company would be benefited, and that they would not be changed, so that those benefits would be destroyed. *Fifth.* On all these questions the plaintiff, by reason of being adjoining and adjacent to this portion of the wharf, as well as the owner in fee of the premises, may invoke the power of a court of equity, and there obtain protection by injunction from the threatened wrong.

Cooley on Const. Lim., pp. 394, 529, 53, 557, 57, 524; *Currier v. Railroad*, 11 Ohio (N. S.) 231; *Coal Co. v. Wighton*, 19 Ohio (N. S.) 560; *Allen v. Jones*, 47 Ind. 442; *Dyckman v. Mayor*, 5 N. Y. 439; *Water Works Co. v. Burkhardt*, 41 Ind. 363; *Gilbert v. Turnpike Co.*, 3 Johns. Cases, 107; *Railroad v. Campbell*, 62 Mo. 588; *Cunningham v. Railroad*, 61 Mo. 33; *Ellis v. Railroad*, 51 Mo. 203; *Railroad v. Canal Commissioners*, 21 Pa. St. 22; *Commonwealth v. Railroad*, 24 Pa. St. 159; *Bridge Co. v. Bridge Co.*, 27 N. Y. 93; *Bradley v. Railroad*, 21 Conn. 306; *Baltimore v. Railroad*, 21 Md. 50; *Leslie v. City of St. Louis*, 47 Mo. 477; *State v. Noyes*, 47 Maine, 207; *Hannibal v. Railroad*, 49 Mo. 481; *Trenor v. Jackson*, 46 How. Prac. R., 397; *Railroad v. Combs*, 10 Bush, 382 (and cases cited); *Louisville v. Mill Co.*, 3 Bush, 416; *Hooker v. Canal Co.*, 14 Conn. 151; *Inlay v. Railroad*, 26 Conn. 255; *Hart v. Burnett*, 15 Cal. 492; *Mayor v. United States*, 10 Peters, 662; *Barclay v. Howell's Lessee*, 6 Peters, 31; 3 Kent, 432; 1 Hawk. P. C. 76, 1; *People v. Kinghman*, 24 N. Y. 559; Bouvier's Law Dic., tit., Highways; *St. John v. The Mayor*, 3 Bos. N. Y. 483; *Lackland v. Railroad*, 31 Mo. 180; *Rutherford v. Taylor*, 38 Mo. 315; *Price v. Thompson*, 48 Mo. 363; *Williams v. Road Co.*, 21 Mo. 582; *Dickey v. Tennison*, 27 Mo. 392; *Williams v. Railroad*, 16 N. Y. 97. (4) Defendant's present ordinance, lease and business are in every respect as gross violation of plaintiff's rights and the rights of the public in the premises, as were those which were before the court at the last hearing of the case, and by the court denounced and condemned, because it is the same old concern, carrying on the same old business at the same old place, with its attitude and relations to the plaintiff and the public unchanged, for it is not subject to any control of the city; it is not temporary but permanent in its character; there are no rules and regulations for its management, it is solely for private profit without any limit as to charges, but

its conscience, and it has none. *Second.* In some respects the present ordinance and lease are a greater violation of plaintiff's rights and the rights of the public, than the former ordinance and lease, because under the former the claim was made, though transparently unfounded, that the warehouse, as then provided for, was solely for the convenience of loading and unloading boats and barges, and, therefore, was an improvement to and an extension of the improved wharf; but under the present ordinance and lease this building and these premises of which defendant has the exclusive possession, are boldly converted into a general warehouse for the storage and handling of grain and merchandise of all kinds, however received by it, whether by boat, railroad, wagon or otherwise; and this upon the land taken from plaintiff by the city by the sword of the law, as a public necessity, as "a public highway for wharf purposes," and for the contemplated benefits arising from which to plaintiff's adjoining property, plaintiff was assessed the sum of twenty-three hundred and fifty dollars, and paid it. *Third.* Defendant's warehouse is a private erection for private purposes, and carried on for private property, upon the public easement and plaintiff's private fee. It was a nuisance when here before, and is a nuisance still. "It would not do to permit property condemned for one purpose to be used for another and different purpose, or property condemned for public use to be appropriated to private use. The latter can no more be done, than could the property in the first instance have been condemned for such use." *Sug. Ref. Co. v. Elevator Co.*, 82 Mo. 127, and authorities there cited.

BLACK, J.—This is a suit to enjoin the defendant from erecting and maintaining a shed or warehouse for the storage of grain or other merchandise upon the wharf of the city of St. Louis. The circuit court, on

the first trial, dismissed the petition, but the judgment was reversed and the cause remanded by this court. 82 Mo. 121. Pending that appeal the defendant erected the warehouse. The second trial resulted in a decree for the plaintiff, requiring the defendant to remove the buildings and restore the ground so that it might be used as a wharf.

The plaintiff is a corporation organized under the laws of this state; and the defendant, the St. Louis Grain Elevator Company, was organized under the special act of December 18, 1863, the third section of which provides: "The corporation hereby created shall have power to acquire, by purchase or otherwise, any real estate in the city of St. Louis, fronting on the Mississippi river, not exceeding five hundred feet frontage on the same in any one locality. The real estate so obtained by this corporation shall not be subject to condemnation for any purpose so long as the same shall be used for grain elevators and uses connected therewith; and the said corporation may also erect one or more grain elevators upon the public wharves of the city of St. Louis, with the consent and under the direction of the constituted authorities of the same." The elevators are to be so constructed as to give railroads a trackway through the same and so as "to accommodate the river interests, giving all requisite facilities for the elevating and storing grain in bulk or otherwise, and so as not to interfere or obstruct the navigation of the river. No provision of this charter shall be construed to interfere with the right of the city to collect wharfage within the city limits."

Besides the general powers to establish and regulate public wharves and docks, and to collect wharfage, the charter of the city of St. Louis, of 1876, provides that the mayor and assembly shall have power by ordinance "to set aside or lease portions of the unpaved wharf for special purposes, such as the erection of sheds, elevators and warehouses, and for railroad tracks, for quay

places for the landing of lumber for mills, for cotton presses, for manufactories, and for any purpose tending to facilitate the trade of the city; but no permit to use any portion of the wharf, or any lease of the same, shall be granted for a term exceeding fifty years."

The city by an ordinance approved the sixth of August, 1864, established a wharf, "as a public highway for wharf purposes," along the river front from Biddle street to the northern boundary of the city. The streets passed going north from Biddle are Ashley, O'Fallon, Bates, etc. City block 226 lies between Ashley and O'Fallon streets, and city block 225 lies between O'Fallon and Bates streets. Both of these blocks are bounded on the west by Lewis street, and at the date of the ordinance establishing the wharf extended east to the river, a distance of about three hundred feet. The wharf as established by the ordinance was opened under condemnation proceedings, instituted by the city in 1867, and by virtue of these proceedings the city condemned the greater portion of the above-designated blocks, leaving only a strip along Lewis street having a width of eighty feet. The plaintiff owned a large portion of both of these blocks, the parts owned by it extending from Lewis street to the river, and received as a compensation for that part which was condemned the sum of twenty-one thousand, six hundred and forty-three dollars. Before the institution of this suit the plaintiff had acquired additional property in these blocks; so that at the commencement of the suit it owned one hundred and eighty feet front on Lewis street in block 226, the whole front of that block being two hundred and fifteen feet. On this property and that owned by plaintiff in block 225 there are coal sheds and other buildings used in connection with the refining works. Plaintiff also owns several blocks of ground on the west side of Lewis street with large buildings thereon, wherein it carries on its business of

refining sugar. The business is extensive, and it is estimated that seventy-five thousand tons of sugar are received annually from boats which are unloaded at the city wharf.

The defendant on and prior to August 18, 1879, owned and operated an elevator which had been built, under its charter, upon the river front and extended southwardly from the south line of Ashley street for a distance of five hundred feet. On the last-mentioned date, the proper city officers, in conformity with an ordinance dated August 8, 1879, leased to defendant ninety by two hundred and ninety-eight feet of the wharf, extending along the water line from the south line of Ashley street northward to O'Fallon, the part thus leased being the entire river landing in front of block 226 and including the foot of Ashley street extended. This lease was for the term of twenty years upon an annual rental of three hundred dollars, and provided that the leased premises should be used by the elevator company "for erecting and maintaining thereon a shed or warehouse for storage and handling of grain or other merchandise in connection with the use of the elevator."

On the foregoing state of facts the circuit court dismissed the plaintiff's bill, but that judgment was reversed and the cause remanded by this court. Thereafter the city passed an ordinance approved December 10, 1884, and in compliance with, and in pursuance to, this ordinance, the defendant surrendered the prior lease, and the proper city authorities executed to it a new one, covering the same portion of the wharf, for a period of fifteen years upon the same rental and for the same purposes, save that the new lease contained these additional stipulations:

"The city of St. Louis reserves the right to cancel this lease on six months' notice in writing to the lessee, whenever it shall elect to pave and extend the wharf on the premises mentioned aforesaid.

"The buildings and structures placed on the said premises by the lessee and the said premises shall, during the term of this lease, be used by the lessee for the storage and handling and loading and unloading of grain and merchandise, and the loading and unloading of boats and barges and vessels and railroad cars engaged in carrying the same, and for no other purpose.

" The city of St. Louis shall retain control over the buildings and structures placed on said grounds by said lessee, and over the use of the same by said lessee, and over the ground covered by this lease, and may at any time, by ordinance, prescribe regulations governing the same and the business of said lessee."

The defendant by an amended answer set up this new lease and now justifies under it.

1. The plaintiff insists that the last lease is as objectionable as the first one, while the defendant insists that it was made in exact conformity to the rulings of this court on the former hearing. The property in question was condemned for wharf purposes, and it cannot be appropriated to a different and inconsistent use ; nor can it or any part thereof be disposed of by the city for private purposes. These general propositions were asserted in strong terms when the case was here before. They are again contended for on the one side, and conceded on the other, so that on these points additional observations are unnecessary.

The principal and important inquiry presented by this record is twofold : *First.* Whether the maintenance of a building upon the wharf to be used in connection with the defendant's elevator for storing and handling grain and merchandise and for loading and unloading boats and railroad cars, carrying such freight, is a use incident to a public wharf. *Second.* Whether the erection and maintenance of the structure in this case is for private purposes only and an illegal use of the wharf for that reason.

In respect of these questions, as this case stood on the old lease, this court said: "In order to meet the demands of commerce, and the changed methods of handling grain and other produce, the city may license the erection of elevators and warehouses in connection with them upon the unpaved portion of the wharf, without violating the rights of the owners of the fee; but she has no right to lease any portion of it for a term of years without a reservation of the right to cancel the lease, whenever it should become necessary to pave and extend the wharf so leased." And further on it is said: "There is no reservation by the city, in the lease to defendant, of any control whatever in the building, or business. The property is conveyed away from the city for twenty years, and, if at any time within that period, it should become necessary to extend the wharf and pave it in front of the block in question, the needed work could not be done. The city has no right, and can acquire none from the legislature, to make such a disposition of the property condemned for wharf purposes, as will prevent her, in the event it becomes necessary to extend and pave the wharf, from doing its duty in that respect." 82 Mo. 126, 127.

In *Illinois, etc., Canal Company v. St. Louis*, 2 Dillon, 70, the city of St. Louis had, by ordinance passed and approved in 1872, leased one hundred and fifty by six hundred feet of the wharf to the Pacific Elevator Company for a period of fifty years with no reserved rights to cancel the same. The ordinance was held to be illegal, because it set aside to the exclusive use of the elevator company the leased portion of the wharf for fifty years, and that the city had no right or power to thus tie up its hands in disregard of the future wants of the public. This was the principal ground upon which the ordinance was held to be invalid. The city of St. Louis then had general power to erect, repair and regulate wharves; but it had no express authority, as it now has, to set aside and lease portions of the

wharf for elevator and warehouse purposes.  The want of such express authority constitutes the substructure of the whole opinion.

Though the city had but general powers to establish, repair and regulate wharves, yet Judge DILLON makes these pertinent and forcible observations: "The dedication of the property was perpetual, and. for the benefit of the public.  The extent of the dedication, its scope, remains the same, but the mode of using property dedicated for a wharf may change from time to time as the wants of commerce or the public may require, and this the dedicator is presumed to contemplate when he makes the dedication.  *  *  *  A wharf is intended to afford convenience for the landing of vessels, the loading or unloading of their cargoes, and to supply a place on which the wares discharged from vessels or awaiting shipment may be laid or deposited ; and it would seem that structures or appliances of any kind intended, and which have the effect to facilitate the handling and preservation of merchandise arriving at the wharf, erected upon it under municipal authority, and remaining at all times subject to municipal control, would be lawful and within the purposes for which the wharf property was acquired or dedicated.  *  *  *  And we are clearly of opinion that the erection, under the sanction of the city, of an elevator to be used in handling grain at the wharf, and at all times under the direction and control of the municipal authorities, is such a use of wharf property as does not fall without the scope of dedication, and such a structure would not, therefore, be a public nuisance."

In *Barney v. Keokuk*, 4 Dill. 593, affirmed in 94 U. S. 325, a strip of land along the river margin had been dedicated to public use for a street, and the plaintiff owned two lots fronting thereon.  The city of Keokuk widened the street in front of plaintiff's lots by filling in stone and earth for a space of about two

hundred feet. A packet company leased from the city a portion of the street thus widened for wharf purposes for ten years, and erected thereon at the water line a building for its own use for storing merchandise for the convenience of shippers and for its own offices, but was not allowed to make storage charges. There was also a railroad freight depot on that part of the street next to plaintiff's lots. It was held that the railroad freight depot was an unauthorized and improper use of the street; but that the packet company depot was a necessary and proper use of the landing and wharf.

There is a wide difference between a street and a wharf. Wharves on our rivers are not only ways for traveling, but they are necessarily used for the deposit of merchandise. The products of the soil and of the manufactories find there a legitimate place of temporary deposit, whether outgoing or incoming. There can be no doubt but a city, having only a general power to establish and regulate wharves, may erect sheds and warehouses thereon to protect such property from damage and theft, and the wharfage charges may be proportioned to the accommodations afforded. So, too, the maintenance of an elevator on a public wharf for handling grain thereat is no new or additional burden or servitude. It is simply a new method for using the wharf for the very purposes for which it was condemned or dedicated. There is no reason or sound law for holding that the old method of shipping grain in sacks and covering them up, whilst on the wharf, with tarpaulins must be continued. Elevators not only furnish a cheaper, better and more rapid method of handling grain, but they economize wharf space, and are to be commended rather than condemned.

This much has been said concerning warehouses and grain elevators because the structure in question, though used in connection with the defendant's elevator, is used for handling grain and other merchandise,

and performs the duties of both a warehouse and an elevator. The erection and maintenance of such a structure is a proper and legitimate use of a portion of a public wharf, when used in handling property going to and from the same. The cases cited from 2 and 4 Dillon justify the conclusion that the city may permit such a structure to be erected and used under a general power to erect, prepare and regulate wharves and to collect wharfage, provided the structure and business is at all times under the control of the municipal legislature. And for a much stronger reason may this be done when, as here, the city has express power to set aside and lease portions of the unpaved wharf for such purposes.

We do not say that the state has the power to confer upon the city the right to turn the wharf to purely private uses, or to charge it with burdens not contemplated by the condemnation, without additional compensation ; but there is a wide field over which the legislature is supreme, and many structures may be justified under legislative sanction which would otherwise be a nuisance.

The lease considered on the former occasion was for twenty years, without any right on the part of the city to terminate it, should the public wants demand such action, and there were no other reserved rights save that of collecting wharfage from boats landing at the leased premises. The city has the right to terminate the lease now in question, on six months' notice, whenever it shall elect to pave and extend the wharf on the leased ground ; and it is also provided that the city may, by ordinance, prescribe regulations governing the business of defendant. It is to be remembered that the city has miles of what is denominated unimproved wharf, and it would be a remarkable state of affairs if portions thereof cannot be used for warehouse and elevator purposes, and especially so in view of the fact that they are proper adjuncts to a wharf.

In *Broadway & Locust Point Ferry Co. v. Hankey*, 31 Md. 347, the legislature conferred upon the ferry company, not the exclusive right of ferrying across the harbor, but the exclusive right of using a designated end of the wharf. The act was upheld and the exclusive right of the company to the particular part of the wharf enforced. The power of the legislature to set apart portions of these public places for designated purposes is illustrated by the case of *Railroad v. Ellerman*, 105 U. S. 166. The present lease is so framed as to enable the city at all times to keep within its charter powers, and there can be no doubt but the lease on its face is valid, and a proper exercise of the charter powers of the city of St. Louis.

The next question is, whether the lease is void on the ground that the property is to be used for private purposes. According to the plain words of the charter of the elevator company, railroads are to have a connection with, and a track through, any elevator erected by it; and the elevator is to be so constructed as to accommodate the river interests, giving all requisite facilities for elevating and storing grain in bulk, or otherwise. The elevator, it will be seen, is made one of the connecting links between the great land and water common carriers. The defendant can show no favoritism between railroads, nor as between different vessels. It must treat all alike, and is bound by its charter to afford requisite facilities to all. This is the plain meaning of the charter, and there is no escaping it. As we understand the evidence, there is a railroad track constructed through the building now in question. The powers granted to, and duties imposed upon, the elevator company of themselves show that the property of the company is clothed with, and has attached to it, a public trust. Just like a railroad or a steamboat, the property is private, and it is operated for private gain, but the use is public. It is true the defendant is entitled to collect compensation for handling grain and other

merchandise, and so may a railroad or steamboat establish rates and collect compensation for transporting persons and property. The wharf itself is not absolutely free, for the city has the right to make reasonable wharf charges, and so may the defendant make reasonable charges when performing wharf duties.

But it is said the city has no control over the charges which defendant may make. If this elevator company has, as we hold, engaged to execute a public trust, then it is subject to public regulations, and the state may prescribe regulations even as to the charges. *Munn v. Illinois*, 94 U. S. 113. Whether the state has delegated the power to the city to regulate charges is a matter of no consequence to the present inquiry. It is enough to know that the combined elevator and warehouse is erected and maintained to aid in carrying on business which has a public trust attached to it, and a business which may be properly conducted at and upon the wharf.

2. The city charter powers in question are "to set aside and lease portions of the unpaved wharf for special purposes, such as the erection of sheds, elevators and warehouses," but the permit or lease must not exceed the term of fifty years. The contention is that the portion of the wharf leased to the defendant was not an unpaved portion thereof, and for this reason the lease is unauthorized by the charter.

There is a diversity of opinion among the witnesses as to what is meant by "paved." Some of them say it means stone cut in parallelograms and laid in the sand, and they call irregular stones set on edge and then covered with macadam riprapping. Others regard the latter as a pavement when laid upon a street or wharf. "Pavement" is a generic term and includes many species. It may be of wood, brick, stone, iron or of many other substances. 2 Dillon on Municipal Corp. [3 Ed.] sec. 769, and note. A pavement is not limited

to uniformly arranged masses of solid material, as blocks of wood, brick or stone, but it may be as well formed of pebbles or gravel, or other hard substance which makes a compact, even, hard way or floor. *Burnham v. Chicago*, 24 Ill. 499. There can be no doubt but macadam is a species of pavement, and may well be called a pavement. But, whether we are considering an agreement or statute, the great object is to get at its true meaning. Here the charter is speaking of a particular wharf, namely, that of the city of St. Louis, and it may well be read in the light of the facts as they existed when it was adopted; we say adopted, because it was framed and approved by the qualified voters of the city of St. Louis, under constitutional authority.

It seems the wharf from Biddle street south to Chouteau avenue was, and is, paved with stone, fashioned to parallelograms, and placed so as to form a convenient place for loading and unloading cargoes, and so as to resist the pressure of heavily loaded vehicles. Other portions were in a state of nature. In 1871 or 1872 the city graded that portion now in question, from the railroad tracks to the water, and paved it with irregular stones, placed on edge, covered with macadam. It was used by a stone company for unloading their barges in 1873, but the high water washed away the macadam, and in 1874 the city built a scavenger dump thereon, and it was used for that purpose until 1879, the date of the first lease to the defendant. A dirt roadway to the dump, made by the city, and accumulated rubbish covered the remaining stone to a depth of five or six feet. The plaintiff never received any sugar or other freight at this place; and the evidence is that it was always too steep and narrow for a boat landing.

Paved portions of the wharf cannot be set aside and leased for warehouse and elevator purposes, but the

exemption applies to that part which is paved in a manner suitable for wharf purposes—for landing and receiving passengers, or for loading and unloading freight. It is perfectly plain that the part of the wharf in question was in no such a condition. For all purposes of a wharf it was unpaved, and could, under the provisions of the charter, be leased for warehouse or elevator purposes.

3.     The defendant, at the date of the lease, held and occupied one hundred feet south from the south line of Ashley street, and the lease in question covers a strip two hundred and ninety-eighty feet long adjoining and to the north thereof; and the contention is that by defendant's charter it can only occupy five hundred feet at any one place. The third section of defendant's charter has been set out in the statement of this case. This charter was enacted before the city extended its wharves by condemnation, and the design of the legislature seems to have been to allow the defendant to own five hundred feet exempt from condemnation. After giving the defendant the right to acquire and hold five hundred feet fronting on the river free from condemnation for any purpose, the section goes on to say: "The said corporation may also erect one or more grain elevators upon the public wharves of the city of St. Louis" with the consent of the city authorities. The limitation is as to the amount of river front which the company may hold exempt from condemnation, but it does not apply to any property which it may occupy on the city wharves by consent of the city authorities. This we are convinced is the true meaning of that limitation.

4.    The defendant's charter gives to it the right to handle and store grain in bulk or in any other way, and the lease in question contemplates that the structure will be used not only for such purposes but for the purpose of handling and storing merchandise, and the latter it is urged is beyond the defendant's charter powers. For all the purposes of the present inquiry it

will be assumed, but not decided, that the defendant's charter does not authorize it to store and handle property, other than grain. We have seen that the city, under its charter, has a perfect right to set apart and lease to natural persons this portion of the wharf for the very purposes for which it has been leased to the defendant. The plaintiff, though the owner of the fee, has no right to complain because the property is used for a warehouse and elevator. No rights of the plaintiff have been invaded, and the complaint is simply this, that the defendant corporation is acting *ultra vires*. The defendant's stockholders and the state may complain, but the plaintiff cannot base a cause of action alone on any such a ground. He must show that some duty owing to him is being violated before he can maintain this suit because the defendant is exceeding its charter powers. The case of *Railroad v. Ellerman*, 105 U. S. 166, is to the point and disposes of this question.

The ultimate question in this case is whether the lease in question is valid, whether the city authorities had the right, under the charter, to make the contract in the lease express. The question is one of vast importance to the commercial interests of the city of St. Louis, and it has been most thoroughly presented on both sides, and it is our opinion that the lease is valid and that plaintiff has no just ground of complaint. The property is being used for the very purposes for which it was condemned and full compensation paid.

The judgment is reversed and the cause remanded with directions to the circuit court to dismiss the bill. Costs of this appeal and costs accruing since the filing of the amended answer setting up the second lease should be taxed to plaintiff, the prior costs to defendant. All the judges concur.