ST. LOUIS TERMINALS CORPORA-
TION, a corporation, Plaintiff-Re-
spondent,

v.

CITY OF ST. LOUIS, a Municipal Corpo-
ration et al., Defendants-Appellants.

No. 36199.

Missouri Court of Appeals,
St. Louis District,
Division Two.

March 30, 1976.

Jack L. Koehr, City Counselor, James J. Gallagher, Associate City Counselor, St. Louis, for defendants-appellants.

G. Lane Roberts, Jr., St. Louis, for plaintiff-respondent.

STEWART, Judge.

Respondent, St. Louis Terminals Corporation, brought a declaratory judgment action against the appellants, City of St. Louis and the Board of Public Service of the City of St. Louis. The respondent will hereafter be referred to as Terminals and the appellants will be referred to jointly as City.

Count I of Terminals' petition sought a declaration that an agreement effective May 13, 1966, entered into between City and Terminals, pursuant to Ordinance 54034 of the City of St. Louis, for the operation of the Municipal Dock known as the North Market Street Dock by Terminals, is a valid and binding obligation. Count II sought judgment enjoining City from breaching the contract and an order that the agreement be specifically enforced. The City appeals from a judgment granting the relief requested. We affirm.

In 1957 the City entered into an agreement with Terminals for the operation of the North Market Street Dock, hereafter referred to as the dock, for a term of 15 years. This contract was awarded to Terminals upon a bid pursuant to Chapter 292, Revised Code of the City of St. Louis (Ordinance 48175), hereafter referred to as Chapter 292, a general ordinance titled "Municipal Quays and Warehouses." Supplemental agreements were entered into in 1962 whereby Terminals made $200,000 in capital improvements.

In 1966 the parties discussed the need for additional capital improvements to attract shippers to St. Louis. Negotiations were commenced toward "extension of [the] agreement" which would cover the remaining term of the original agreement and grant to Terminals the option to renew for 3 additional 5 year periods.

The result of the negotiations was a proposal for a new agreement. In March of 1966 the City enacted Ordinance 54034 which authorized the City to enter into the agreement with Terminals as set forth in the Ordinance. This agreement was executed by the parties and became effective May 1, 1967, for a period of 5 years with an option to Terminals to renew for three additional 5 year periods.

The agreement granted to Terminals "the exclusive right and privilege of occupying and using [the dock]" for the purposes of operating the dock. In brief, Terminals agreed to pay "tollage/rental" upon specified cargo handled by it. The "tollage/rental" rates increased 10% in the second 5 year period, 20% in the third period, and 30% in the fourth 5 year period. A minimum annual "tollage/rental" fee was also provided, with increases in each of the 5 year periods. The agreement recites that Terminals had previously invested $203,-442.00 in capital improvements and that it agreed to invest a minimum of $500,000.00 for additional capital improvements within the original 5 year period of the agreement. The improvements are to become the property of the City. Terminals has complied with the terms of the agreement.

In 1973 the City enacted Ordinance 56450. The Ordinance recites that it repeals Ordinance 54034 which it refers to as granting a franchise to Terminals. This Ordinance provides that the Board of Public Service should call for bids from persons interested in operating the dock, and further provides in minute detail the terms to be required of the successful bidder.

Succinctly stated the issues to be determined are whether Ordinance 54034 which authorized the contract of 1966 was validly enacted, and secondly whether Ordinance 56450 in fact repealed Ordinance 54034 and thus terminated the agreement of May 1966.

■ Preliminary to our discussion we must determine the nature of the agreement of May 1966. City, in its brief, alternately labels the agreement a "lease" and a "franchise". A lease has been said to be "a contract for the possession and profits of property in consideration of a rent, and a franchise being a special privilege, granted by the government." 37 C.J.S. Franchises § 7, p. 150. In the case before us the contract grants to Terminals the "exclusive right and privilege of occupying and using [the dock]." The consideration for the grant was denominated "tollage/rental" with the additional consideration of constructing additional capital improvements which were to become the property of the City at the termination of the agreement, which may be classified as rent. This agreement can be more properly termed a lease as distinguished from a franchise and is not governed by Article XIX of the Char-

ter of St. Louis, which covers the subject of franchises, as contended by the City. See *Greene Line Terminal Co. v. Martin*, 122 W.Va. 483, 10 S.E.2d 901, 903 (1940). Our determination is further fortified by the provisions of Article I, Sec. 1(16) of the Charter of the City of St. Louis which grants to the city the specific power to lease portions of the wharf. Clearly the intent of this agreement was to exercise the authority granted by the Charter.

■ The City contends that the contract of May 1966, is "void and invalid" because it did not comply with Chapter 292, the general Ordinance regulating the operation of municipal docks, which had been expressly repealed or amended by Ordinance 54034, which authorized the contract.

Without detailing the requirements of Chapter 292 suffice it to say that the agreement of May 1966 does not comply with the terms of Chapter 292. In fact Ordinance 54034 acknowledges that it is a departure from the terms of Chapter 292.[1]

A similar contention was made in *Ruschenberg v. Southern Electric R. Co.*, 161 Mo. 70, 61 S.W. 626, 629 (1900). There was, in that case, an ordinance regulating the speed of street railway cars at a maximum of 8 miles per hour. A subsequent ordinance granted the defendant a franchise and provided for a speed limit of 15 m. p. h. In that damage suit the plaintiff claimed that the 8 mile an hour speed limit was applicable. The rule, as stated in that case, is applicable here, l.c. 629:

". . . we are not required to hold it is a repeal, and is therefore void, because not an express repeal, because when there are two . . . ordinances, one of which is special and particular, and certainly includes the matter in question . . . and the other general, which, if standing alone, would include the same matter, and thus conflict with the special act or provision . . . the special act must be taken as intended to constitute an exception to the general act or provision, and not a repeal."

Ordinance 54034 constitutes an exception to Chapter 292 and is not invalid for the reasons espoused by City.

■ City contends that the Ordinance is void because it does not comply with Article IV, Sec. 10 of the Charter which reads:

"The style of every ordinance shall be: Be it ordained by the City of St. Louis as follows."

Without setting out the Ordinance in detail suffice it to say that the Ordinance contains such a clause and thereafter incorporates, by reference, the contract, which is set out in full in the title. In any event an omission of the ordaining clause would not invalidate the Ordinance. Our courts have long held that such requirements as to the form of ordinances are directory and not mandatory; and that the omission will not invalidate the ordinance. *City of St. Louis v. Foster*, 52 Mo. 513, 514 (1873).

The remaining contentions are that the agreement is invalid because it permits Terminals to set the fees; it constitutes an absolute divestment of public property without a right of re-entry; and it constitutes a grant of public money in aid of a private corporation in violation of Art. VI, Sec. 25, Mo.Const.1945.

Common to each of these contentions is the nature of the authority granted to the city with respect to wharves and docks. Article 1, § 1(16) provides that the City shall have the power "to . . . rent or lease for not exceeding twenty-five years portions of the wharf for any purpose tending to facilitate the trade of the city."

■ For the purposes of this case the most significant power which the City is granted in the Charter provision is to "rent or lease" the docks. We have heretofore determined that the agreement entered into was a lease. The term lease must be taken in its ordinary meaning. It is generally held that a lease is a species of contract for

---

1. The wording of the Ordinance is: "Notwithstanding the terms and conditions of Ordinance 48175 (Ch. 292)."

the possession and profits of land for a determinate period, which must be less than the term of the landlord, with the recompense of rent. 51C C.J.S. Landlord and Tenant § 202(2), p. 519. A lease creates an estate in the tenant with transfer of exclusive possession and control of the premises to the tenant subject to such conditions as may be imposed by the terms of the contract creating the tenancy. *Friend v. Gem International Inc.*, 476 S.W.2d 134 (Mo.App. 1971).

■ When the City has exercised its Charter power to lease the docks, the lessee must of necessity have all of the rights of a tenant under the ordinary business lease, subject only to the restrictions and conditions set out in the contract between the parties. The Charter places no limitations on the power to lease, except that it may not exceed 25 years. If one is to have the "possession and profits" of the property leased, he must have the power to set the charges for his services and merchandise necessary to provide such profits. This is recognized in the agreement in this case. By the contract Terminals is empowered to set charges which are to be reasonable and to be applied without discrimination. Upon objection, the question of reasonableness is to be determined by arbitration if it cannot be settled between City and Terminals. City cites *Clay v. City of St. Louis*, 495 S.W.2d 672 (Mo.App.1973) in which this court held that the City could not by ordinance delegate to the Airport Commission the legislative power to set landing fees at the municipal airport. The court was there dealing with the question of delegation of discretionary power to an administrative body; a body created to administer the municipal airport. The power to maintain and operate the airport is not one specifically granted by charter but is conferred by the broad general powers of a municipal corporation. See *Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W.2d 1045 (Banc 1928). The charter grants no specific authority to establish the method of operation of the airport. In the case of the municipal docks the charter specifically grants the power to lease.

In *Matthews v. City of Alexandria*, 68 Mo. 115 (1878), cited by the City the City of Alexandria was indebted to Matthews and leased the wharf to him and permitted him to collect wharfage in payment of the debt. The court there said, l.c. 119, "By the charter of the city of Alexandria, authority was conferred upon the city council to erect, repair and regulate public wharves and docks, and to fix the rate of wharfage thereat. Acts 1849, 352; Acts 1851, 393. No authority was given by the charter to the city to lease the wharf, or farm out its revenues, or to empower any one else to fix the rates of wharfage." The deficiency noted in that case is not present here. The Charter of the City of St. Louis grants the specific authority to lease. The fact that Terminals may set the fees within the limitations set forth in the agreement does not in this case render the agreement invalid.

■ The thrust of City's argument that the lease constitutes an absolute divestment of public property without a right of re-entry eludes us. The lease follows the power granted by Charter which provides that the City may "rent or lease for not exceeding twenty-five years." If all options are exercised the life of the lease will be twenty years which is well within the limitation imposed.

City in support of its contention cites *Belcher Sugar Refining Company v. St. Louis Grain Elevator Company*, 82 Mo. 121 (1884). In that case the city had condemned certain property including property of Belcher for wharf purposes. The City leased a large portion of the property for a shed or warehouse under charter authority to "lease portions of the unpaved wharf for special purposes . . . such as the erection of sheds, elevators and warehouses." The one question presented was whether this lease was for a purpose other than that for which the property was condemned. It was held that in view of the changed methods of handling produce the City could license the erection of warehouses upon the unpaved portion of the wharf in connection with the operation of the wharf. The

court, however, held that the City must reserve the right to "cancel the lease, whenever it should become necessary to pave and extend the wharf." The court gives no specific authority or reason for the latter assertion. While we question the validity of the statement and entertain doubt as to its meaning we do not feel that it has any effect upon this case.

We are not faced with the question presented in that case. There is no doubt but that the lease here was for the public purpose of operating a dock which was open to all in need of it. In any event the lease in this case provides that the parties have agreed that the responsibility to keep the docks maintained is in the City. The parties have agreed that the work on City owned property and structures deemed necessary and which is approved by City shall be performed by Terminals on behalf of City. This plus the fact that City has the right of inspection along with the further provision that upon default of Terminals as to any of the terms of the agreement City has the right to "re-enter" removes any objection that might be read into *Belcher.* We have also reviewed the subsequent case of *Belcher Sugar Refining Company v. St. Louis Grain Elevator Company,* 101 Mo. 192, 13 S.W. 822 (1890). It lends no further support to City's position.

■ City contends that the lease constitutes a grant of public money or property to a private corporation in violation of Art. VI, § 25, Mo.Const.1945, because the rental received is grossly inadequate. City cites us to no cases nor has our research revealed any. We have found a comment with respect to a similar contention. In *Cleveland Stevedore Co. v. City of Cleveland,* 16 Ohio Misc. 91, 241 N.E.2d 290, 293 (1968) it was said of the lease payments of docking berths: "Financial return in the form of lease payments is not the sole criterion, however, and other benefits such as an increase in the flow of goods through the port may properly be sought." This very thought was also considered by City at the time it passed the Ordinance. Upon completion of negotiations the City's Comptroller in a letter to Terminals said, ". . . we . . . look forward to the final consummation which will provide many long term benefits to the City's economic progress."

The bond issue for improvement of the docks was not based upon any commitment to Terminals. The fact that City exercised its Charter authority to lease the dock after making improvements upon it did not violate the provisions of the Constitution.

There is no contention and indeed there is no indication of bad faith, fraud or abuse of discretion on the part of the Board of Public Service or on the part of the Board of Aldermen who passed the Ordinance which authorized the lease.

In the view that we have taken of this case, the fact that Terminals has made a profit from the operation of the dock or the extent of the profit is not relevant.

The agreement of May 16, 1966, was a valid contract of lease in accordance with the Charter provisions of the City of St. Louis.

■ Having reached the conclusion that the agreement was a valid and binding contract it necessarily follows that Ordinance 56450 is void. The Constitutional prohibition against any "law impairing the obligations of contracts . . ."[2] is applicable to Municipal Ordinances. *Neill v. Gates,* 152 Mo. 585, 54 S.W. 460 (1899).

We have reviewed other matters argued by City but find no merit in them.

The judgment of the trial court is affirmed in all respects.

CLEMENS, P. J., concurs.

KELLY, J., dissents in separate opinion.

KELLY, Judge (dissenting).

I cannot concur in the decision of the majority that the "Agreement" of May 1, 1967, can properly be termed a lease. We are concerned here with a wharf—the

2. Article I, § 13 Const.Mo.1945.

North Market Street Dock—erected with public funds from a Bond Issue voted for dock and waterfront improvements pursuant to the power bestowed on the City to construct wharves. Ordinarily a municipal corporation has no proprietary rights in its public wharves, and whatever rights it has in them it holds in trust for the public. 56 Am.Jur. Wharves, § 25. Public wharves, by their nature, are for the use of the public and a lease of a wharf is a particular kind of a lease, being merely a letting of the franchise of wharfage; no property in or right to the wharf itself passes to the lessee. 94 C.J.S. Wharves § 5a, *New York Pilot Comm'rs v. Clark*, 33 N.Y. 251, (1865), *Taylor v. Beebe*, 26 N.Y.Super. 262 (1865). It is in this context that the power to lease a *portion* of the wharf for any purpose tending to facilitate the trade of the City was bestowed upon the City in Art. I, § 1(16) of the Charter of the City of St. Louis. This same Charter provision is the source of the City's authority to provide and maintain a harbor and wharves, to regulate the use thereof, and to impose wharfage and other charges therefor.[1] The term "lease" when used with reference to wharves has a meaning different than when used in respect to ordinary lessor-lessee contracts. It is not necessary to burden this opinion with a lengthy discussion of the law of Navigable Water, but it cannot be contradicted that the Mississippi River is a navigable stream. Nor, do I believe, that it is open to debate that the facility plaintiff is "operating" is a public wharf constructed as an aid to navigation and commerce along the Mississippi River. The Supreme Court, in *Belcher's Sugar Refinery Co. v. St. Louis Grain Elevator Co.*, 101 Mo. 192, 13 S.W. 822 (1890), l.c. 824, took notice of the nature of a wharf, when it said:

"A wharf is intended to afford convenience for the landing of vessels, the loading or unloading of their cargoes, and to supply a place on which the wares discharged from vessels, or awaiting shipment, may be laid or deposited; . . .

Wharves on our rivers are not only ways for traveling, but they are necessarily used for the deposit of merchandise."

Because of the nature of a municipally owned wharf, and more particularly, a public wharf, we believe that it should not go unnoticed that both the Charter of this City of St. Louis empowering the City to lease its wharves specifically limits that power to lease "portions" of the wharf. § 237.220, RSMo. 1969, V.A.M.S., likewise limits a lease to "any portion" of the City wharf. This term "portion" implies less than the whole. The phraseology of the provision of the City Charter of the City of St. Louis was chosen, in my opinion, to prevent the leasing by the City of the entire wharf to any one lessee. The statute, § 237.210 RSMo. 1969, V.A.M.S.—enacted in 1872— precludes any lease of a City wharf to any owner or association of owners of any steamboat, or boats or, vessels so as to give any such lessee a monopoly of said portion of such wharf. This is a logical restriction with respect to the right of the public to use a municipally owned wharf.

*Belcher*, supra, provided that the defendant, which was organized under a special act creating a corporation for the purpose of acquiring frontage on the Mississippi River not in excess of 500 feet for the erection and maintenance of grain elevators and uses connected therewith, upon the public wharves of the City of St. Louis and when the lease executed between the City and the defendant corporation, only a "portion of the unpaved wharf" was leased to the defendant, the remainder of the wharf being left available for public usage. This was held to be a valid exercise of the power granted the City by the Charter of 1876 to "set aside and lease portions of the unpaved wharves for special purposes," among which was for the erection of grain elevators.

A reading of the "agreement" demonstrates that the City "granted" to "the Operator" the exclusive right and privilege of "occupying and using" the "dock and termi-

---

1. § 237.210 RSMo. 1969, V.A.M.S. empowers cities to lease any portion of a city wharf for a term of years.

nal facilities" including the City railway tracks and the river frontage to a point eight feet north of the north end of the old dock. The consideration to be paid the City by the "Operator" was based on "tonnage handled through the Terminal." The "Operator" guaranteed the City a minimum "annual tollage/rental" of $37,500.00 per annum during the first 5 years of the "Agreement," of $41,250.00 during the second 5 years and $45,000.00 during the third 5 years, and $48,750.00 for the final 5 year period. In addition it agreed to make certain capital improvements in addition to those already made under the prior agreement. The Operator was required, at its own expense, to provide, operate and maintain the necessary merchandise and cargo handling equipment and such other equipment as may be necessary for the proper operation of the Terminal. The Operator was further required to provide and furnish to waterway users without discrimination or favoritism adequate terminal services including services for loading, unloading or transferring of freight from barge to car, from car to barge, from barge to truck, from truck to barge, and for mooring, shifting and pumping barges. Charges for these services, although set by the "Operator" were, upon protest to the City, subject to a hearing on their reasonableness, and if not settled there, they were then to be submitted to arbitration. Sec. 9 of the Agreement also required that the business to be conducted on the premises was to be that of a public river-rail-truck terminal for the handling of waterborne cargo, storage incidental to the transportation of waterborne cargo or incidental to the development of waterborne commerce, and all other activities that contribute to the development of the Port of St. Louis and terminal distribution operations. This "Agreement" constitutes in my opinion, a franchise because it involves a grant by the sovereign to a corporate entity the exclusive right to operate for a term of years a public wharf and the public services ordinarily evident thereto.

Respondent's contention that the Agreement of May 1, 1966, is void is based upon that section of Ch. 229, Ordinance 48175

R.C.C. St. Louis, § 292.030, and more particularly that part of the section requiring all contracts entered into by the Board of Public Service on behalf of the City for stevedores or other services for the handling of freight to be let upon competitive bidding to the lowest responsible bidder. The majority opinion acknowledges that the Agreement does not comply with the terms of Ch. 292. Appellants, in their brief and argument, espouse the position that Ch. 292 does not control because the "basic authority" for such leases comes from Article 1, § 1(16) of the City Charter, and admits non-compliance with Ch. 292. Respondent further contends that Ordinance No. 54034, the ordinance approving the Agreement now under attack, was enacted pursuant to the Charter provisions and therefore, whether Ordinance No. 54034 is an outright repeal of Ch. 292 for the purposes of this Agreement or a qualification of Ch. 292 for the purpose of this Agreement, it is neither a repeal nor an amendment to Ch. 292 and that Chapter has no application here. Respondent further argues that Ordinance No. 54034, being later in time and the more specific of the two, controls. In support of this latter contention respondent leans on *Laughlin v. Forgrave*, 432 S.W.2d 308 (Mo. banc 1968) so that this Ordinance No. 54034 should be considered an "exception to, or qualification of, the prior general one, . . . ." The *Laughlin* case was not a contract problem where the validity of a contract or franchise grant was at issue; rather, it was a case where the question was whether, in a suit for damages in a medical malpractice case, the two year statute of limitations relating to malpractice actions applied or the general statute of limitations was controlling. That case is inappropriate here. Nevertheless, the majority opinion, relying on *Ruschenberg v. Southern Electric R. Co.*, 161 Mo. 70, 61 S.W. 626, 629 (1900), concluded that by enacting Ordinance No. 54034 the Board of Aldermen of the City created an exception to Chapter 292 and the Agreement of May 1, 1966, is therefore valid. *Ruschenberg* involved an "exception" authorizing a fran-

chise to operate its street cars at a speed not greater than 15 m. p. h. in the area where the plaintiff's minor child was killed whereas the speed allowed in a prior general ordinance limited the speed of the "cars" to 8 m. p. h. In upholding the 15 m. p. h. speed ordinance, the court identified the issue before it as: "In an ordinance passed by the City in strict compliance with Article 10 of the Charter, and fixing a new rate of speed under new and changed conditions, necessarily in conflict with the old ordinance, fixing eight miles an hour as the maximum speed for horse cars." The court held that the new franchise ordinance was an "exception," a special ordinance, to the general ordinance which was meant to apply to "horse cars" whereas the special ordinance was meant to cover cars propelled by electricity; that therefore there was no intention to repeal the general ordinance. No question of the granting of the franchise was raised in *Ruschenberg* and for that reason I am not of the opinion it should influence the decision reached here.

Ch. 292 of the Revised Code of the City of St. Louis is legislation concerning the supervision and control of Municipal Quays and Warehouses, and a "Quay" is defined in § 292.010 as: "Any structure owned by the City, built on the Mississippi River shore and extending therefrom to deep water, so that boats may lie alongside to receive and discharge freight." While the Charter authorized the City to lease wharves, it set up no procedure whereby the City might enter into a contract for that purpose; this, the Board of Aldermen did by enacting § 292.-030. There is in the Charter no requirement that a granting of a franchise or a lease of a portion of the City owned wharf be subject to bids and let upon competitive bidding. Nevertheless, the Board of Aldermen in § 292.030 so provided. However, this the Board of Aldermen could properly require. *City of Excelsior Springs v. Ettenson*, 120 Mo.App. 215, 96 S.W. 701 (1906). The original Agreement between the parties was subject to this section of Chapter 292. Respondent did not choose to exercise its option to continue the operation of the municipal wharf under the terms of that Agreement as it neared the end of the first 5 year term. Rather, in an apparent effort to avoid the requirement that a new Agreement be let on bids and awarded to the "lowest responsible bidder," the Board of Aldermen, without repealing or amending Ch. 292 enacted Ordinance 54034 and by-passed the bid requirement of § 292.030 by merely stating in Sec. 2 of the "Agreement" that "Notwithstanding the terms and conditions of Ordinance 48175 (Chapter 292), approved February 13, 1957, and notwithstanding the terms and conditions of an agreement between the parties entered into May 1, 1957, and supplement thereto dated February 27, 1962, this Agreement is entered into pursuant to Ordinance . . ." Both parties to this appeal are in agreement that Ordinance 54034 does not constitute a repeal or an amendment to Ch. 292. It is apparent that the purpose of the Board of Aldermen in requiring that the leases for the Quays and Warehouses be submitted to competitive bidding and be let to the lowest responsible bidder was intended to secure free and unrestricted competition among bidders, eliminate fraud and favoritism, and obtain the most remunerative contract for the City while at the same time affording the public enjoying the services afforded by the wharf the least expensive and most efficient operation. There is, in this record, no evidence to support a conclusion that there was any fraud in the enactment of Ordinance 54034; however, the writer fears that approving the avoidance of the requirements of § 292.030 by the mere usage of the term "Notwithstanding" and holding that an "exception" to bid requirements on city contracts, even when bids are not required by the City Charter or State law, sets a dangerous precedent and points the way to abuse.

For the foregoing reasons I would hold Ordinance 54034 void.