Thomas N. Dysart, Appellant, v. City of St. Louis et al.—11 S. W. (2d) 1045.

Court en Banc, December 7, 1928.

516

*Cobbs, Logan & Alexander* for appellant.

*Julius T. Muench*, *Oliver Senti* and *Richard S. Bull* for respondents; *Benjamin H. Charles* and *Carl Trauernicht* of counsel.

520

WHITE, C. J.—The plaintiff, a resident and taxpayer of the city of St. Louis, brought this suit to restrain the city, the Mayor, Comptroller and Treasurer, from issuing and delivering certain bonds voted upon at an election held in St. Louis August 7, 1928, the date of the regular primary provided by law.

An ordinance was passed providing for the submission of a proposition to the voters of the city of St. Louis on August 7th, the primary day, to issue bonds in the sum of two million dollars for the acquisition, improvement and development of land for an airport with the necessary landing, field buildings, runways, and other appurtenances, etc.

Prior to the passage of the said ordinance, on June 21st was held the usual revision of registration of voters for the primary which took place August 7th. The advertisement for the submission of the bond proposition was published after the revision, June 21st. On August 7th the primary election was held and votes cast for and against the proposition to issue two million dollars of bonds mentioned, 120,012 being cast for the proposition, and 21,412 cast against the proposition. Later the city adopted an ordinance declaring the result of the election and ordered the issuance of the bonds.

The petition alleges that the election was void for several reasons.

*First,* because the purpose of issuing the two million dollars of bonds is not a "public purpose" within the meaning of Section 3, Article X, of the Constitution, nor a "municipal purpose," within the meaning of Section 11, Article X, of the Constitution, nor a "lawful, public, or municipal purpose" within the meaning of Article I, Section 1, of the Charter of the City of St. Louis, or Article XVII, Section 1, of the charter.

*Second,* that the purpose for which the said indebtedness is to be incurred is not one for which the funds of the city of St. Louis derived by taxation may be legally spent.

*Third,* that the special election submitting the said proposition was illegal and unlawful in that there was no previous revision of the registration of the voters of the city of St. Louis prior to said election, as required by Sections 35 and 40 of the Act of 1921.

As to the first and second objections to the election above mentioned I cannot do better than to quote from the opinion of Judge RAGLAND written on a former hearing of this case, as follows:

"I. The first question presented by the record is whether the proposed indebtedness of $2,000,000 is to be incurred for a public purpose. The Constitution of this State provides that 'taxes may be levied and collected for public purposes only.' [Sec. 3, Art. X, Constitution.] This provision embodies a well-settled principle of constitutional law. Even in jurisdictions whose constitutions contain no such limitation on the taxing power, it is universally agreed that an attempt to raise money by taxation for private purposes is unconstitutional; that it is a taking of property without due process of law; that it violates fundamental principles inherent in free government.

"But, though the principle that taxes may be levied for public purposes only is one of universal acceptance, its application is often difficult. What constitutes a public use is not easy to define. [State ex rel. v. Orear, 277 Mo. 303, 210 S. W. 392; Halbruegger v. St. Louis, 302 Mo. 573, 262 S. W. 379.] It is said: 'In deciding whether, in a given case, the object for which the taxes are assessed falls on the one side or the other of this line, the courts must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxa-

tion. . . . Perhaps the best test of rightful taxation is that the proceeds of the tax must be used for the support of the government or for some of the recognized objects of government, or directly to promote the welfare of the community. It may also be conceded that that is a public purpose from the attainment of which will flow some benefit or convenience to the public. In this latter case, however, the benefit or convenience must be direct and immediate from the purpose, and not collateral, remote or consequential. It must be a benefit or convenience which each citizen of the community affected may lay his own hand to in his own right, and take unto his own use at his own option, upon the same reasonable terms and conditions as any other citizen thereof.' [26 R. C. L. 46.]

"The 'test of rightful taxation' referred to in the preceding paragraph is one of appellant's points of attack on the proposed bond issue. His language is expressive; we quote it in part:

" 'It will afford a starting and landing place for a few wealthy, ultra-reckless persons, who own planes and who are engaged in private pleasure flying. They may pay somewhat for the privilege. It will afford a starting and landing place for pleasure tourists from other cities, alighting in St. Louis while flitting here and yon. It will offer a passenger station for the very few persons who are able to afford, and who desire to experience, the thrill of a novel and expensive mode of luxurious transportation.

" 'The number of persons using the airport will be about equal to the total number of persons who engage in big-game hunting, trips to the African wilderness, and voyages of North Pole exploration. . . .

" 'In the very nature of things, the vast majority of the inhabitants of the city, a ninety-nine per cent majority, cannot now and never can, reap any benefit from the existence of an airport.

" 'True, it may be permitted to the ordinary common-garden variety of citizen to enter the airport free of charge, so that he may press his face against some restricting barrier, and sunburn his throat gazing at his more fortunate compatriots as they sportingly navigate the empyrean blue.

" 'But beyond that, beyond the right to hungrily look on, the ordinary citizen gets no benefit from the taxes he is forced to pay.'

"It is unquestionably true that the airplane is not in general use as a means of travel or transportation, either in the city of St. Louis or elsewhere; and it never will be unless properly equipped landing fields are established. In this connection the language of the Supreme Court of Kansas is apposite:

" 'Aeronautical development emphasizes the vital importance of "airways," an essential element of which is the landing field or air-

port. The term "airway" applies to air routes for either airplanes or seaplanes. An airway is far more than a mere air line. It is a material and permanent way through the air, laid out with the precision and care that an engineer adopts in choosing the course of and laying down of a railway. Whether over land or water, it is essentially on the ground. Its existence and general layout depend almost entirely upon the commercial demand. The primary requisite of any airway is that it shall be safe, reliable and regular. These attributes can be gained only if it is adequately laid out and equipped, and first and foremost of these attributes are airports or landing fields. The demand for more and more airports throughout the country is urgent and will continue to increase. A typical example of a modern airway is the transcontinental route between New York and San Francisco, said to be the most completely equipped airway in the world. On it between New York and Salt Lake City are 12 airports and 92 intermediate fields, connected by 612 electric and gas route beacons spaced along and indicating the entire distance. The electric beacons of 1,000,000 and 2,000,000 candlepower are, in general, located at or near intermediate fields and are spaced approximately 22 miles apart with the smaller gas beacons between.

" 'The airway is essentially a free highway. As such it is open to all qualified aircraft. It is rightly, therefore, a Federal undertaking to lay out and equip airways. The maintenance of airports, however, comes legitimately within the scope of the municipality in much the same manner as docks and harbor facilities for marine shipping. Airports are said to be as important to commerce as are terminals to railroads or harbors to navigation. Municipalities are studying local conditions and commercial organizations are pressing the importance of establishing terminal airports and of providing proper lighting for landing fields, and facilities such as hangars, garages and repair shops. The possession of the airport by the modern city is essential if it desires opportunities for increased prosperity to be secured through air commerce. Lands susceptible of improvements, as parks, playgrounds, or general recreational purposes, may be utilized and developed around the modern airport so that the municipality may bring to itself not only the advantages of air commerce, but afford its citizens those other inestimable advantages of improved beautification and health-giving opportunities. It is said that there were 3800 landing fields in the United States at the close of 1926 of which 400 were municipal. [See 1927 Aircraft Year Book, p. 101, et seq.] In a dozen cities of the Far West (California, Oregon, etc.) projects for new airports or improvements of existing facilities are under way at an estimated cost of more than $8,000,000. [American City, July, 1927.] In these rapidly changing times, even a wise man cannot discern the needs of the

future . . . Perhaps it may not be a "great way" into what ordinarily would be termed the "far distant future" when the human race will be flying with wings similar to those described by Bulwer Lytton in "The Coming Race." ' [City of Wichita v. Clapp, 263 Pac. 12, 14, 15.] There is small doubt but what this prophetic vision will speedily come to pass and that within a comparatively few years the use of the airplane will be as general as that of the railroad and motor vehicle.

"As a further reason for his insistence that an airport is not a public purpose for which the city of St. Louis may incur an indebtedness, appellant urges that the exercise of no governmental function or corporate act is required, but that on the contrary an airport can be better provided through private initiative and by private capital. This contention is based on the holding in State v. Orear, supra, that the business of making and selling ice is not a public purpose. There is, however, no analogy between the manufacture and sale of ice and the acquisition and maintenance of an airport. The latter is a necessary instrumentality in a new method or system of transportation which requires public aid for its development and final establishment. The situation with respect to it is very like that which existed with reference to the building of railroads in this country something like three-quarters of a century ago. At that time the people of many of the different cities and towns were so desirous of having the benefits of railroad connection that they sought and secured authority from the Legislature of their State to aid the railroads with municipal funds, either as a loan or as a direct gift, or by subscription to the stock, or by guaranteeing the bonds or other indebtedness of the railroad companies. The question then arose whether a municipal corporation could be authorized to expend in this manner funds raised by taxation. Though at the beginning there were some dissents, it finally became established by the courts that the expenditure of public funds in behalf of a railroad is an expenditure of public funds for a public use. The decisions for the most part were put on the broad ground that the increased prosperity of a community which might be expected to result from the new means of travel and transportation made the purpose a public one. And so we say with respect to the expenditure of public funds for an airport.

"We have not overlooked the fact that during the period just referred to many counties in this State incurred obligations in aid of railroads to such an extent that they were unable to meet them, and that to prevent the evil effects of such unrestrained subscriptions of public money for that purpose a constitutional provision was adopted, in 1875, prohibiting a county or other municipality from subscrib-

ing to the capital stock of a railroad corporation, or donating money to it, or lending it a credit in aid of it. [Sec. 6, Art. IX, Constitution 1875.] But the subsequent adoption of the constitutional provision in no wise affected the principle that the expenditure of public money in aid of railroads is an expenditure for a public purpose. In this connection it should be further said that the ordinance in question in this case is in no way violative of either the section of the Constitution last referred to or related sections. [See Haeussler v. St. Louis, 205 Mo. 656, 683, 684.]

"The question of whether the acquisition and control of a municipal airport is a public purpose within the purview of the constitutional principle heretofore adverted to is obviously a new one. The courts which have had occasion to consider it have, however, answered in the affirmative. [City of Wichita v. Clapp, supra; State ex rel. City of Lincoln v. Johnson, State Auditor (Neb. 1928), 220 N. W. 273; State ex rel. Hile v. City of Cleveland (Oh. App. 1927), 160 N. E. 241.] And no court of last resort, so far as we are advised, has ever held the contrary. Not only that, but the governmental nature of the function involved is given tacit recognition in numerous recent statutory enactments, both State and Federal: Laws of Georgia 1927, p. 779; R. S. Kan. 1923, 3-110; Public Acts, Connecticut, 1925, Ch. 249; Laws of Massachusetts 1922, Ch. 534, sec. 57; Laws of Montana 1927, Ch. 20; General Code of Ohio, Par. 15, sec. 3677; Penna. Act No. 323 of 1925; Act 254 of 69th Congress (the Federal Air Act). We have no doubt as to the soundness of the view which obtains.

"II. It is next contended by the appellant that, even if it be held that the acquisition and maintenance of an airport is a public purpose, it is not a municipal or city purpose. By this he means, as we understand, that such acquisition and maintenance does not fall within the scope of the powers which may be constitutionally delegated to a city.

"It is said to be a cardinal principle of our system of government that local affairs shall be managed by local authorities and general affairs by the central authority. The line separating matters of local or municipal concern and those affecting the State at large is not, however, always easy to discern. In many instances long usage and the analogies it affords must be brought to bear in making the determination; keeping in mind in such cases, however, that the trend of authority in recent years has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment. Cities have long exercised the power: to acquire, construct, maintain, control, supervise and regulate docks, wharves, and harbor facilities, including the making of river and harbor improvements in connection therewith; to own and operate

ferries; to lay out and improve roads and highways; and to construct and maintain canals, bridges and other works of internal improvement of a public character. The building of a bridge connecting the cities of New York and Brooklyn by those cities, was held to be a city purpose as to each. [People v. Kelly, 76 N. Y. 475, 487.] It was also held by this court that the building of a bridge across the Mississippi River at St. Louis for the benefit of the public, by the city of St. Louis, was a public city purpose. [Haeussler v. St. Louis, supra.] An airport with its beacons, landing fields, runways, and hangars is analogous to a harbor with its lights, wharves and docks; the one is the landing place and haven of ships that navigate the water, the other of those that navigate the air. With respect to the public use which each subserves they are essentially of the same character. If the ownership and maintenance of one falls within the scope of municipal government, it would seem that the other must necessarily do so. We accordingly hold that the acquisition and control of an airport is a city purpose within the purview of general constitutional law.

"The point is suggested, but not pressed, that the power to establish and maintain an airport is not within those granted the city of St. Louis by its charter. While there is no specific reference to an airport in the charter, there can be no doubt but that the power in question is expressly conferred by the broad all-comprehensive language employed in the granting of powers, when construed conformably to the rule of construction which the charter itself provides. [St. Louis Charter, Art. I, sec. 1, paragraphs 8, 15, 32, 33 and 35; Art. I, sec. 2. See also St. Louis v. Baskowitz, 273 Mo. 543; Halbruegger v. City of St. Louis, 302 Mo. 573.]

"III. It is further contended that the city of St. Louis is without power to borrow money for the purpose of acquiring and maintaining an airport, even though such purpose be both public and municipal. This contention is disposed of by our holding that the power to establish and maintain an airport is conferred upon the city by its charter, for by Section 8656, Revised Statutes 1919, any city in this State may contract a debt in excess of annual income *for any purpose authorized in its charter,* upon the assent of two-thirds of the legal voters of such city at an election held for that purpose, and by Section 8659, Revised Statutes 1919, as amended by the Laws of 1927, page 318, may issue bonds covering the amount of such debt. It also appears that the power to issue the bonds in question is conferred by Section 1 of Article XVII of the Charter. The relevant charter provisions, as well as the applicability of the statute, with reference to the city's

authority to issue bonds, are fully considered in Halbruegger v. St. Louis, *supra,* and what is there said is apposite here. For that reason a further elaboration of the question in hand is deemed unnecessary.''

The above quotation from Judge RAGLAND'S opinion satisfactorily disposes of the points considered.

IV. Appellant next asserts that the law requiring registration, and particularly regarding the necessity of a ''previous revision'' of the registered list, in anticipation of an election to vote bonds, has not been complied with, and therefore the bonds are void. He depends upon the provisions of Sections 35 and 40 of the Act of 1921, relating to registration in cities of one hundred thousand inhabitants or more.

Section 22 of the act (Laws 1921, 2 Ex. Sess., p. 21) provides that in every year in which a presidential election occurs, *general registration* shall be held on Monday, Tuesday, Wednesday and Thursday of the sixth week prior to election. Section 35 (Laws 1921, 2 Ex. Sess., p. 34), provides as follows:

''Sec. 35. Intermediate registration provided for.—At every election, and at every primary election for state and county offices held in such city after this act becomes effective and between general registrations, the last general registration shall be continued in force and used, and *the same shall be revised,* in conformity hereto, by the board of registry of each precinct where such election is to be held, and for that purpose the board of registry shall meet on Thursday, six weeks preceding such election, or primary election. . . .''

That part of Section 40 which is pertinent is as follows:

''Sec. 40. Revision of Registry—when made.—At any special election occurring in a portion of such city only, or which is to fill a vacancy occurring in a single office, or which is to submit proposition or amendments to a vote of the people, there shall not be a previous revision of the registration: Provided, however, that at any special election at which is to be submitted a proposition to increase the indebtedness of any such city, by borrowing money, there shall be a previous revision of the registration.''

The discussion turns upon that proviso.

This bond election was on the regular day for the primary election, August 7, 1928. There was a ''previous revision'' June 21, 1928, as required by Section 35, six weeks previous to that primary election. Appellant contends that this was not a ''previous revision'' as required by the proviso to Section 40. The argument is that the revision, while at the time required by statute, must have been with a view to the bond election with notice to the electors that such bond

election was to be held, and the revision of the registration made for that special purpose. So, this resolves itself into a question of notice; notice before the revision took place that the question of issuing bonds would be voted on at the regular primary election. The effect of this position is that unregistered citizens, who pay little or no attention to their civic duties, except when it immediately affects their payment of taxes, might have been induced to register at this previous revision if they had had notice of the contemplated vote on the issuance of bonds.

Respondents on the other hand claim that the previous revision is for all purposes; that the right to vote is not only a privilege but a duty, and the citizen must comply with all conditions necessary to enable him to perform that duty. He must observe all regulations which preserve to him the free exercise of his right and the potency of his ballot.

This recalls the discussions in the early days of the Republic, when the function of the citizen was debated and the principle settled that the sovereign power of the State is lodged in him, not in government, nor in its officials. The citizen is sovereign, and the right to vote is the distinguishing badge of his sovereignty. Therefore a heavy responsibility rests upon him to discharge that sovereign function and at all times keep himself within any regulation necessary for that purpose. If he fails to do so he voluntarily abdicates.

At this point it is interesting to consider the provisions of the Constitution of Missouri upon that subject; Article II, Sections 1 and 32: "All power is vested in and derived from the people;" "All government of right originates from the people;" "The enumeration in the Constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people."

The general rule is that the purpose of a registration is to regulate the exercise of suffrage, not to qualify it. It is intended to prevent fraud and thereby give full effect to the vote of the honest voter. [20 C. J. 81.]

No law can *give* a citizen the right to vote. It can only provide methods to give due effect to his vote by eliminating frauds and excluding the incompetent. Article VIII of the Constitution relating to elections does not confer the right of suffrage upon anybody; it *restricts* the right to *exercise* suffrage by eliminating ineligibles. With that right, unabridged and unimpaired, goes the responsibility of the citizen in its discharge. Hence, respondent argues, the previous revision of the registration provided for by Section 35 is a revision for all purposes and covers every proposition which may be submitted at the ensuing election, with a view to which such revision takes place. And the previous revision provided in Section 40, before an election to increase indebtedness, must refer to a special

election held at a time other than when an election regularly takes place as provided by law.

In this connection we have Section 8657, Revised Statutes 1919, which requires that "for the purpose of testing the sense of the voters of any incorporated city, town or village upon a proposition to incur debt . . . the board of aldermen shall give notice . . . Such notice shall be advertised by publication once a week for three consecutive weeks . . . The first publication of the notice shall be made at least twenty-one days before, and the last shall be within two weeks of the date of the election."

Such notice was given in this case and there is no complaint that it was not in due form.

The "previous revision" required by Section 35 must be six weeks before the election with a view to which it is made. The notice of a bond election may be only three weeks before, and it could not be longer than five weeks before. How can Section 8657 be reconciled with the six weeks' previous revision requirement?

It is the duty of the court in construing statutes which appear to be in conflict, to reconcile them if possible with the general legislative purpose. Sections 35 and 40, coming in the same act and referring to the same thing, must be held to be in harmony with each other. Section 35 requires a previous revision to be six weeks before "every" election, and Section 40 requires a previous revision before a special bond election, it must mean that such revision must be six weeks before. "Previous revision" as the words are used in Section 40 must mean the same thing as when used in Section 35. The context implies it, and there is nothing to distinguish them. If a bond election should be held at a time other than a general or a primary election would anyone contend that the previous revision required by Section 40 could be less than six weeks before? No shorter time is expressly provided for, nor can one be implied.

Section 8657 was repealed in 1927, and another section by the same number, and, so far as this matter is concerned, to the same effect, was enacted. [Laws 1927, p. 317.]

At that time the Act of 1921 had been in force six years and was before the eyes of the legislators, with its requirements about previous revision of the registration six weeks before regular or primary election. They knew that Section 40 of the act, in requiring a "previous revision" before a special bond election, did not provide for any notice of such special election other than that required in Section 8657. They knew that ten days' notice of registration (which must include a revision—Section 16 of the act) required only a designation of the *"time and place;"* that there was no requirement anywhere of notice of the *purpose* of a revision of the registration. Suppose a special election should be called to vote on

a bond issue at a time other than any fixed by law with the notice required by Section 8657, and suppose a previous revision were had six weeks before the election with the ten days' notice required by Section 16 of the act, would anyone say that such special election would be void, although the only notice of the *purpose* of the election would be that provided by Section 8657. If we should so hold we would require a notice which the lawmakers did not. We cannot legislate, nor can we read into the statute a provision not already there.

Section 40 requires a *previous revision* of the registration. Literally in this case there was a previous revision. Should that statute be construed as having a meaning beyond the content of its terms? If notice of the purpose of the revision was necessary in order to qualify voters to vote on a bond proposition at a general election, then there would be two revisions on the same day, one required by law and one in accordance with the special notice. That the Legislature definitely fixed a time and manner of giving notice of a bond election, which must begin *after* any revision, authorizes the presumption that they intended the revision to be for all purposes, for all elections and for all propositions that might be voted on at any ensuing election. Every person is presumed to know the law. Every voter knew that a previous revision must be six weeks before *any* election, and knew that less than five weeks' notice was required of any election to vote an indebtedness; that such a proposition might be submitted *after* any revision of the registration, that the last quadrennial registration would be "continued in force" and "used" and if he, the voter, had changed his residence so as to become ineligible where he was registered, he must comply with the regulation which would keep unimpaired the exercise of his right of suffrage.

This brings us to a definition of the term "special election" as it occurs in Section 40 of the Act of 1921.

Respondent contends that a special election is one which takes place at a time different from an election provided for by general law; an election which must be specially called. This view is supported by what has already been said.

A definition of "General Election" appears in Section 7058, Revised Statutes 1919, as "the election required to be held on Tuesday succeeding the first Monday of November, biennially." Under that definition a general election could occur only once in two years. Should we, therefore, conclude that every other election which takes place at any other time, whether required by law to be regularly held or not, is a "special election?" There appears no such legislative intention.

It was held by the Springfield Court of Appeals in Haas v. City of Neosho, 139 Mo. App. 293, that a primary election was not a general election, within the meaning of the local option law, providing that such local option election could not be held within sixty days of a general election. The court quoted the above definition now in Section 7058. That section has been in the Revised Statutes since the revision of 1889, long before the enactment of the general primary law, which therefore could not have been included in the definition of general election.

Later enactments indicate a legislative intention to consider a special election as one not provided for by general law, but one which must be especially called.

In Section 3 of the Act of 1921 (p. 334), the board of election commissioners is given charge of "all elections, general, special, local, municipal, state and county, and all others of any description," thus indicating that any one of those enumerated may be general or special whether state or local.

Section 17 of the act (p. 339), makes holidays of "general, state, county or primary election days."

The punctuation would classify a general election as distinct from a state election, which is absurd. So the comma after "general" in that section is evidently misplaced and in view of the context the word "general" is meant to apply to each kind of election mentioned following the word.

Section 27 (Laws 1921, 2 Ex. Sess., p. 27) has the following:

"On the Tuesday, Wednesday, Thursday and Friday of the fifth week preceding such general county, city or state election."

There is no comma after "general" as there is in Section 17. It is a general county election, a general city election, or a general state election.

Then note the language of Section 40, as follows:

"*At any special election* occurring in any portion of such city only, or which is to fill a vacancy occurring in a single office, *or which is to submit a proposition or amendments* to a vote of the people, there shall not be a previous revision of the registration."

In each one of those contingencies a special election would necessarily be at a different time from a regular election which takes place by law at stated times. For instance this language: "Or which is to submit a proposition or amendments to a vote of the people." In other words, which is for the *purpose* of submitting a proposition or amendments to the people. That would necessarily be a *called* election.

Note the words "special election" in the proviso: "*Provided,* however, that at *any special* election *at which is to be submitted a proposition* to increase indebtedness."

"Special election" certainly means nothing different in the proviso from what it does in the main part of the section. It is "any special election" like those first enumerated "which is to submit a proposition or amendments to a vote of the people" one called for that purpose.

But the definition of "general election" is settled by an amendment to the Constitution adopted in 1920, by which Section 12 of Article X was repealed, and another section by the same number adopted. It provides: "No county, city, town, township, school district or other political subdivision of the State shall become indebted, except by a two-thirds vote at an election held for that purpose;" and, "*such proposition may be submitted at any election,* general or special."

It follows that any local election, city, county, etc., may be either general or *special,* and this wipes out the definition of "General Election" in Section 7058, or limits the implied distinction to state elections.

It necessarily means that a special election is one called for a special purpose, not one fixed by law to occur at regular intervals. A primary election and a regular election are connected together in Section 35 in regard to general registration, with the same requirement for a revision before a primary election as there is before a final election to elect officers. Therefore it avails nothing to distinguish a primary election from the statutory definition of any other general election.

V. But it has been suggested that although a special election is one called for a special purpose, it may not be called for the day  on which a regular general election takes place. That theory will not survive scrutiny in the light of the sections already examined and other enactments and constitutional amendments.

Recurring again to the Constitutional amendment adopted in 1920, Article X, Section 12, containing these words in relation to incurring indebtedness: "Such *proposition* may be submitted at *any* election, general or special."

The *proposition may be submitted* at a "general election." It does not say that a special election is *to be called* on a general election day.

True that Section 12 uses the expression, "at an election called for the purpose," but those words, in view of the context, mean only an election at which the proposition is submitted.

Then, Article XV of the Constitution, relating to Constitutional amendments, was amended in 1920 to allow a proposed amendment

to be submitted, "at the general election, or at a special election called by the Governor in his discretion prior to such general election, at which he may submit any one or more of such proposed amendments."

Here is an indication of an intention on the part of the Constitution-makers to define a special election as one especially called at a time different from the day of any election which comes regularly according to law. The definition of "election" in Section 88 of the act, shows that a general election may be local as well as statewide.

The theory that a proposition, other than the election of officers, submitted on the day of a general election, is a "special election," leads to absurd results. Some propositions or amendments are submitted by referendum, some by initiative, some by proclamations of the Governor, etc. If each were a special election we might have a dozen elections on the same day, administered by the same judges, and the voter would vote in a dozen elections, in several of them possibly on a single ballot, and the vote on all of them deposited at one and the same time.

The Act of 1921 does not contemplate anything of that kind. Section 61 provides for separate abstracts on separate sheets for the votes cast, for different officers, for presidential electors, etc., and votes for and against "any proposition submitted" to a vote of the people. All the results are kept separately, and the votes on "propositions" submitted are treated like other votes. It is all one election.

Section 56 (p. 363), relating to the certificate to be made by the judges and clerks at an election, says: "In case *a proposition* of any kind has been submitted to a vote at *such* election, *such* statement shall also show the number of votes cast for or against *such proposition*." "Such election." "Such statement." "Such proposition." That means, if anything, *one* election and *one* statement of the result, including the vote on any proposition submitted.

Then we have Section 4792, Revised Statutes 1919, as follows:

"In all counties in this State in which a special election shall be held for the purpose of voting upon any proposition to issue bonds for any purpose, which, under the law, must be submitted to the vote of the qualified electors for determination, two judges and two clerks of such election shall be appointed by the county court for each special election precinct: *Provided, that the provisions of this law shall not apply when any such proposition is submitted to be voted upon at a regular primary election or a general election.*"

Thus the judges of the election are the same for all purposes at a general election. A proposition to issue bonds may be submitted at a *regular primary* election, and such submission does not constitute it a special election.

It is a matter of common knowledge that at nearly every general election propositions are authorized and submitted to the voters as special propositions. Submissions of these special propositions are not, in common parlance, called special elections. They are merely votes on special propositions submitted at a general election.

The rulings in other states are conflicting upon this subject, but the weight of the authority favors the definition that a special election means one taking place at a time different from that at which an election fixed by law is held.

Cases to the contrary are Hill v. Hartzell, 252 Pac. (Ore.) 552, and Construction Co. v. Sedgwick, 100 Kan. 397, in each of which the holding seems unnecessary to a decision of the case.

In point is the Central Illinois Service Co. v. Taylorville, 307 Ill. 311. There a proposition to issue bonds was submitted at a general election and proper notice was given of the proposed submission. It was held that it was not necessary to designate for the purpose the clerks and judges already designated for the general election. The court said (1. c. 313):

"The fact that a public proposition was submitted made it no less a general election."

And further (1. c. 314):

"This act provides, as we have seen, that such question shall be submitted at the general election, or a special election if such has been called, or at a special election called for that purpose. The election in this case was a general city election."

In Fitzmaurice v. Willis, 127 N. W. 95, the court had under consideration the provisions of the registration law of North Dakota, and a special proposition submitted at the general election for the formation of a new county. The court had occasion to consider the meaning of a "general election" and made this statement:

"We are of the opinion that when the registration of electors is required, . . . the term 'general election' is used in the statute containing these requirements to identify and *designate the whole election held on Tuesday after the first Monday in November* in even numbered years, and that it applies to all electors desiring to vote on that day either for the election of state officers or on *any other question submitted at the same time*." (Italics ours.)

In Kenfield v. Irwin, 52 Cal. 1. c. 169, this definition appears:

"Special elections are such as are held to supply vacancies in any office, and are held at such times as may be designated by the proper board or officer."

In State ex rel. Fish v. Howell, 59 Wash. 1. c. 498, occurs this:

"It is not necessarily the time and manner of holding an election to fill a vacancy that makes it a special election, but the fact that it

is held at a time other than the time fixed by law to elect officers for regular or defined term.''

Consider the situation August 7, 1928:

There was *one* set of judges and clerks, each of whom was sworn *once* faithfully to discharge his duty at *one* election. Each voter was handed all tickets at *one* time; he went into the booth *once* and voted for all candidates of his selection and on all propositions submitted at *one* time; his name was recorded as having voted *once.* If challenged he would have qualified *once,* for all purposes. It was *one* election.

If the voter had only registered at the revision June 21st, would he have been disqualified to vote on the bond issue because that revision was *not* for that purpose? Even election judges, the most technical officials known, would not so hold.

Why should Section 40 require a previous revision for ''any special election'' *only,* unless it was because Section 35 provided for a previous revision for all regular and primary elections?

If the legislators had meant to have a special revision for any bond election, they should have said ''any election at which a proposition to increase indebtedness is to be submitted,'' instead of ''any special election.''

If every submission of a proposition to vote bonds is a special election, whether falling on the day of a general election or not, why should the lawmakers use such an expression as ''any special election?'' It can only be used to distinguish it from a general election at which the proposition might be submitted.

The reasonable legislative intention must have been that the ''previous revision'' before a special bond election, required by Section 40, means before an election for which there was already no previous revision provided by law.

The previous revision in this case did in fact eliminate all registered who had become ineligible, and no one, who was unable to vote on the bond issue by reason of failure to register, is complaining. This shows the efficiency of the method pursued, and the general comprehension by the voters of their rights and duties as considered above.

The judgment is affirmed. *Atwood, Blair, Gantt* and *Gentry, JJ.,* concur; *Walker, J.,* concurs in the result; *Ragland, J.,* concurs in Paragraphs I, II and III.