**GORSUCH, Appellee v. SPRINGFIELD (City), Appellants.**

Ohio Appeals, Second District, Clark County.

No. 448.   Decided March 31, 1945.

84

Orville Wear, Springfield, Cole & Hodge, Springfield,. for appellee.

Raphael J. Quirk, City Solicitor, Springfield, Malcolm E. Spencer, Special Counsel, Springfield, Anderson & McKee, Springfield, for appellants.

NICHOLS, J., of the Seventh District, sitting by designation.

## OPINION

By NICHOLS, J.

Plaintiff, Leslie C. Gorsuch, recovered a judgment against the defendants, City of Springfield, Ohio, and Board of Park Trustees, in the sum of $14,500.75, for personal injuries received by him as the result of an explosion of gas in a building situate upon premises known as Snyder Park in the City of Springfield, Ohio.

From such judgment, appeal on questions of law is prosecuted to this court. The parties will be referred to herein as plaintiff and defendants.

In his petition, plaintiff stated, in substance, that the City of Springfield is the owner and trustee of a public park grounds, located within its corporate limits and known as "Snyder Park", which it maintains and operates through the agency of the Board of Park Trustees appointed by the City Sinking Fund Commission, of which the individuals named in the title are the members.

Among defendants' activities in connection with such park is the maintenance and operation of a golf course upon the park property where the citizens of Springfield and others are invited, solicited and permitted to play golf under certain conditions and rules and upon payment to defendants of

certain fees for such privilege, with the result that defendants have built up a large patronage of such golf course and each year collect substantial sums of money from its patrons.

Plaintiff further alleged that defendants have erected or caused to be erected upon the park property, adjacent to the golf course, a building and structure which they designate as the Snyder Park Club House, for the benefit and convenience of those patronizing the golf course, and such building contains, among other things, a lounge, a locker room, a room equipped with showers for shower baths, and a boiler room; that defendants sell the privileges of this club to those who may desire them for certain payments of money which purchases the right to use the golf course, club, lockers, showers and lounge; that there was installed in the club house, in the room known as the boiler room and adjacent to the locker room, a hot water heater designed to be operated by natural gas as fuel and of the type known as the Ruud heater.

The petition further alleged that on June 22, 1939, plaintiff, in company with the park superintendent, visited the park and while being escorted through the premises by the superintendent, upon reaching the Ruud heater, defendants, through their superintendent, carelessly and negligently applied a lighted match to the pilot light of the heater, with the result that there was immediately a terrific explosion of escaped gas inflicting serious injuries upon plaintiff.

It was alleged that the explosion was caused as follows:

That a certain flat spring, controlling the pilot light of the Ruud heater, had theretofore become defective in the respect that a portion of the same was broken off so that notwithstanding extinguishment of the pilot light, natural gas would continue to feed into the heater and would be ignited upon contact with any flame, all of which defendants then and there and prior to the explosion, well knew, or in the exercise of ordinary diligence could easily have ascertained, but nevertheless defendants continued to negligently and carelessly maintain and operate such heater in such dangerous and unsafe condition, with the result above described.

Furthermore, that defendants through such superintendent, negligently and carelessly attempted to re-light the pilot light in such heater in a manner contrary to the warning and instructions printed thereon, in this respect, that while such heater carried a printed legend warning that if such pilot light should go out the entire gas supply should immediately be shut off with no attempt to re-light the same for at least five minutes thereafter, nevertheless these defendants, through such superintendent and upon observing that such

pilot light had gone out, ignored such instructions and immediately applied a lighted match thereto, with the result above indicated.

It is further alleged that for some time prior to June 22, 1939, defendants had full notice and knowledge of the defective condition of such hot water heater but negligently and carelessly failed and neglected to repair the same, although having ample time so to do; and in maintaining and operating such heater at that time these defendants negligently and carelessly failed to keep the public ground and building, known as Snyder Park Club House, open, in repair and free from nuisance.

A particular description of the injuries received by plaintiff due to such explosion is set forth in the petition and prayer is made for judgment against defendants in the sum of $30,717.75.

Demurrer was filed to plaintiff's petition on three grounds, unnecessary here to state, it being sufficient to say that in our opinion there was no error in the overruling of such demurrer by the trial court.

By answer to plaintiff's petition, defendant, after admitting that the City of Springfield is a municipal corporation and as such holds legal title to and is trustee of the grounds known as Snyder Park, which is maintained and operated by a board of park trustees; that a golf course is maintained in such park together with the building described in plaintiff's petition, all of which were maintained for the use of the public upon payment of certain fees; that to provide hot water for the use of the building including the showers there was installed a Ruud water heater operated by natural gas as a fuel; and that at the time, or about the time alleged in the petition, plaintiff, in company with the park superintendent, was in the building when an explosion occurred, further set forth five defenses to plaintiff's petition as follows:

1. A general denial;

2. The operation of the golf course and building in the public park as a governmental function;

3. That said park grounds, building and golf course were not under the care, supervision or control of the Council of the City of Springfield (city commission) and that it cannot, therefore, be held responsible for a nuisance created or maintained therein;

4. That there was no negligence of the defendants in the plans or construction of the building or equipment installed therein, including the hot water heater, and that defendants had no notice, actual or constructive, of any defect therein but that plaintiff's injuries were caused solely by the negligence of the superintendent; and

5. That plaintiff at the time was only a licensee and not an invitee on the premises.

The reply of plaintiff denies the averments of the second, third, fourth and fifth defenses of the answer.

Claim is made by defendants that the trial court erred in overruling its motions to take the case from the jury and dismiss the action, such motions being made at the conclusion of plaintiff's case and at the conclusion of all the evidence; in refusing to give special charges requested by defendants; in its general charge to the jury; and in refusing to submit to the jury the question as to whether the grounds where the accident occurred were public or private, and as to whether plaintiff was a licensee or invitee, as requested by defendants.

There can, of course, be no error prejudicial to defendants by the action of the trial court in taking from the jury the issue of nuisance set up in plaintiff's petition.

There is practically no dispute as to the facts in this case.

The record discloses that John Snyder and David L. Snyder, by deed executed June 17, 1895, conveyed the tract of land containing 210 acres and water rights and known as Snyder Park to "the city of Springfield upon the trusts hereinafter declared* * * in order to dedicate them to the free use and enjoyment of the inhabitants of the city of Springfield * * * as a public park, and secure their perpetual maintenance for this use and for no other purpose or use whatsoever."

In such deed, it is provided that "the said city shall enclose and improve the same as a public park and perpetually maintain the same as such for the free use and enjoyment of the inhabitants of said city, and that no part of the same shall at any time ever be used for any other purpose or purposes whatsoever", with certain exceptions not necessary here to note. "Provided always that this conveyance and each of the easements therein granted and all the authority therein conferred are subject to this express condition that if the said city of Springfield does not within eighteen (18) months from the date of this deed expend not less than Twenty-Thousand ($20,000.00) Dollars in the enclosure and improvement of the said lands, premises and water rights as a public park, then this conveyance and each of the easements and all of the authority therein conferred shall become null and of no effect and the said lands, premises and water rights shall revert to the grantors and their heirs."

The record further discloses that by last will and testament David L. Snyder bequeathed to the city of Springfield the sum of $200,000.00 face value United States 4% registered

government bonds to hold, manage and invest the principal in such manner as is now or may hereafter be provided by law for the investment of funds by guardians and trustees of individuals and to use the income and profits arising therefrom in improving, beautifying, equiping and maintaining the public park, such fund to be kept distinct from all other funds of the city, except other funds acquired for the same purpose, and the management and investment thereof and the disbursement of its income to be under the control of the board or committee having from time to time the care or charge of the park. Certain safeguards relating to the management and investment of the fund are provided for in the will, to the end that the principal of the fund shall never be impaired.

Defendants called as their witness the clerk of the city commission of the city of Springfield, who testified that he was the clerk of all city boards including the board of park trustees; that the city commission appoints the sinking fund trustees; that the sinking fund trustees appoint the board of park trustees; that the board of park trustees appoint the park superintendent; and that the endowment funds provided in the will of David L. Snyder are kept in the custody of the city treasurer.

It further appears from the record, without contradiction, that the members of the board of park trustees holding that position at the time plaintifff was injured were the persons named as such in the caption of plaintiff's petition; and that Ed Hartmann was by such board of park trustees duly appointed superintendent of parks.

It is further shown by the record, and uncontroverted thereby, that the salary of the park superintendent was paid from the Snyder Park fund, the amount of such salary being certified by the city auditor in his report to the county auditor of the total compensation paid all employees of the city of Springfield; that the industrial insurance premiums covering the employees of the city were deducted by the county auditor from the tax settlement and paid by the auditor into the Workmen's Compensation Fund and the city had acquiesced in such payments by permitting such deduction; that the park board has control of the operating fund of Snyder Park —they approve the payrolls and approve all bills before the city auditor issues warrants for the payment thereof; and that the investment of the park funds, including the endowment fund, was in the hands of the board of park trustees and an advisory board. All of such operation of Snyder Park is in accordance with the state law providing therefor.

90

The record discloses, without contradiction, that by resolution of the board of park trustees the operation and maintenance of the municipal golf course located in Snyder Park was placed in the hands of a commission of five to be appointed by the board of park trustees outside of its membership, to be known as the golf commission, and the president of the board of park trustees and the park superintendent be ex-officio members of this commission; that all matters relating to the operation and maintenance of the municipal golf course shall be in the hands of the golf commission, subject to such rules and regulations as from time to time may be provided by the board of park trustees and under the general supervision of that board; that in carrying out any plans or work in connection with their duties the commission shall advise with the park superintendent who will co-operate with the commission in the maintenance and operation of the golf property; and that all improvements and changes of a permanent nature shall be first submitted to the park superintendent and have the approval and sanction of the board.

It is thus seen that Ed Hartmann was not only park superintendent but ex-officio a member of the golf commission with general supervision and over-sight of the golf park. His office was located in the golf club house, he carried a key to the room containing the lockers, showers, the hallway involved, and the boiler room where the Ruud water heater was located and in which room were kept supplies for use and sale in the operation of the golf club.

It is further undisputed in the record that on the evening of June 22, 1939, plaintiff and his wife were sitting on the front porch at their home in Springfield when Mr. Hartmann, the park superintendent, and his wife came to their home and invited plaintiff and his wife to take a ride in their automobile. With Mrs. Hartmann driving the car, they went to the vicinity of the golf course where the club house is located, at which time Mr. Hartmann asked plaintiff if he would care to look over the club property. The invitation was accepted, the ladies going into the lounge room of the club house, plaintiff and the superintendent going first into the superintendent's office, then into the locker room. After inspecting that room, the superintendent led the way through the hallway toward the lounge. On the right side of this hallway was a door leading into the boiler room where the Ruud water heater was located. The superintendent opened this door, entered the boiler room, observed that the pilot light of the Ruud water heater was out, and thereupon the superintendent lighted a match, evidently for the purpose of re-lighting the pilot

light, at which instant an explosion occurred which seriously burned the superintendent and plaintiff.

The park superintendent died before the trial of this case and without having given his testimony. Whether his death was due to the injuries received at the time of the explosion does not appear, although it is shown that his injuries were quite serious.

There is no testimony contradictory to that of plaintiff to the effect that he had not entered the boiler room but was standing in the doorway leading thereto at the time the explosion occurred.

It is further uncontradicted that this Ruud water heater had been installed in the boiler room about two years previous to the explosion and that attached to the Ruud water heater there was a caution plate which read as follows:

### "CAUTION

"Heater must be connected to flue having good draft. Should the pilot flame be extinguished, close gas cock "A" and pilot valve "B". Do not relight pilot flame before waiting five minutes.

"For relighting pilot flame and putting heater into operation again see direction on Ruud Automatic Gas Cut-off.

"For relighting pilot flame and putting heater into operation again see direction on Ruud Automatic Gas Cut-Off.

"For further information see printed directions."

Attached to the gas cock referred to as "A" on the quoted caution plate and riveted to the heater and to the valve arm was a sign which read:

"A
"Before Lighting Pilot
"CLOSE THIS VALVE"
"See direction plate"

Photographs of the caution plate and gas cock "A" are admitted in evidence as exhibits distinctly showing the quoted caution and directions above set forth.

Without contradiction, the record discloses by the testimony offered on behalf of plaintiff and confirmed by the testimony of a member of the golf commission that the golf club house was built about 1936 or 1937; that the golf commission approved the plans therefor and recommended them, which would necessarily mean that the park superintendent, by virtue of the resolution hereinbefore referred to, had ap-

proved such plans and co-operated with the commission in the maintenance and operation of the club property.

Uncontradicted in the record, it is shown not only in the testimony on behalf of plaintiff but by the member of the golf commission who testified on behalf of defendant that during the years 1937, '38 and '39 funds were received for privilege fees for the use of the golf course and club house, including the showers, lockers, etc., and for supplies sold in connection with the operation of the golf course as follows:

For the year 1937,—$11,529.83;

For the year 1938,—$11,788.32; and

For the year 1939,—$11,786.31.

At least a part of these receipts were expended for permanent improvements and betterment of the golf property, a part thereof for operating expenses and a part for the purchase of supplies leaving a gross balance of such receipts for the three years of $5,669.86.

The record discloses that after the explosion, the plumber sent to repair the Ruud water heater discovered that a certain steel spring, not necessary to the operation of the heater except for safety purposes in the event the pilot light would go out, was broken. The plumber testified that this Ruud automatic water heater was of an approved design in general use in homes and other buildings, and that even though the steel spring referred to had been broken previous to the explosion, the heater would operate efficiently so long as the pilot light remained lighted. There is no evidence in the record that the spring was broken before the explosion. The testimony indicates that the pilot light might go out for certain causes, including the result of high winds. Just what caused the pilot light to go out on the day in question is not shown.

The trial court, after giving before argument certain special instructions requested by defendants, stated to the jury in the general charge:

"The second defense raises an issue as to whether in the operation of said golf course and clubhouse the defendants exercised a governmental or proprietary function. You are instructed that this is an issue of law for determination of the court, and the court says to you that under the pleadings and the evidence said function is proprietary, and, therefore, the plaintiff has the right to bring and present this action. But you must further definitely understand that this does not mean that plaintiff necessarily can recover damages; whether he can will be determined by you through

consideration of the other issues explained throughout this charge.

Another issue for your consideration is whether or not the defendant had knowledge of some defect in the heater at said clubhouse, and, while there is an averment of the petition that the operation of said heater became a nuisance and constituted a nuisance, you need give such claim of nuisance no consideration whatsoever, as the court instructs you its operation cannot be held to be a nuisance as meant by the law.

A further issue is whether plaintiff was injured, and, if so, whether the negligence of the superintendent, if any negligence existed, was a proximate cause of such injury or injuries, and further, the nature and extent of such injuries and resultant damages, if any.

The claim of plaintiff is founded on what is called in law "negligence", which is defined to be the want of ordinary care. And ordinary care is that care which persons of ordinary prudence are accustomed to exercise under the same or similar circumstances. It may consist of doing something which ought not to be done or in not doing something which ought to be done but in an improper and careless manner.
* * * * *

The negligence complained of by plaintiff in this case is that the superintendent carelessly and negligently applied a match to the pilot light of the heater causing an explosion, and, therefore, you must determine from the evidence whether such superintendent did so apply said match, and if in so doing did he fail to exercise ordinary care.

To recover in this case the plaintiff must establish by a preponderance of the evidence that said superintendent was guilty of negligence which was the proximate cause of his injuries, if any, he suffered."

It is thus observed that the court held as a matter of law not only that the city was acting in a proprietary capacity in the operation of the golf course and club house but that there was no issue for the jury, under the evidence, as to whether the park superintendent was the agent of the city acting in the course of his authority when he expressly invited plaintiff upon the premises of defendants, and that defendants were liable if the park superintendent was negligent and such negligence was the proximate cause of plaintiff's injuries, and the jury so finding their only further duty was to determine the extent of plaintiff's injuries and damages.

If the trial court was right in holding as a matter of law that the city at the time was acting in a proprietary capacity; that the park superintendent was the agent of the city for whose negligence defendants were liable; and that plaintiff was rightfully upon the premises by the invitation of the park superintendent, then it necessarily follows that there is no error arising upon the record in this case prejudicial to the rights of defendants.

We call attention to the fact that although defendants moved for directed verdict at the close of plaintiff's case, defendants, not relying on that motion, proceeded to the introduction of their evidence and renewed the motion for directed verdict at the conclusion of all the evidence. From the facts stated, we hold there was no error in the overruling of such motions.

If the evidence is such that reasonable minds could not differ as to any of the issues so decided by the trial court as a matter of law, then the court was right in not submitting such issues to the jury. The jury should not be permitted to guess as to issues which are so established by the uncontradicted evidence.

From our close and careful examination of the record, we conclude that the trial court did not err in determining as a matter of law the issues referred to. It follows that there was no error in refusing to charge the jury before argument in the respects referred to in defendants' assignments of error.

Ohio is definitely committed to the doctrine that except for the provisions of §3714, GC, there is no liability on the part of a municipality in actions for tort if the function exercised by the municipality at the time of an injury was a governmental function, but the doctrine is equally well-established that if the function being exercised by the municipality is proprietary and in pursuit of private and corporate duties, for the particular benefit of the corporation and its inhabitants, as distinguished from those things in which the whole state has an interest, the city is liable in tort.

In **Wooster v. Arbenz, 116 Oh St., 281,** Chief Justice Marshall had laid down the tests whereby may be determined the distinction between governmental and proprietary functions. Other cases in point may be found by reference to the subject in Ohio Jurisprudence.

It is sufficient for the present case to say that if the city in the maintenance and operation of its municipal golf course was directly compensated or benefited by growth and prosperity of the city and its inhabitants, and the city had an election to do or omit to do the acts set forth herein as shown by the evidence, the function is private and proprietary.

It cannot be said that the city was enjoined by any law to maintain and operate the golf course and club house in Snyder Park. It had an election to do or omit to do so. It was directly compensated and benefited by the operation of the golf course and club house in the manner shown by the evidence in this case. The benefits consisted in obtaining the money from privilege fees, etc., with which to make permanent improvements to the park, and by securing a profit therefrom the taxpayers of that city were relieved to that extent from the levy of taxes for that purpose. The city was benefited by revenue received in the operation of a business which is customarily carried on by private persons and corporations in their proprietary capacity. It may well be that under circumstances differing from the uncontroverted facts shown by the evidence in this case, the issues hereinbefore referred to would properly be presented to the jury for determination, but where the evidence is clear and uncontradicted as in this case, there was no issue of fact for the jury except such as were properly submitted to it by the trial court.

So far as concerns the principles involved in determining the legal questions governing this case, we particularly refer to the opinion of the Supreme Court in City of **Toledo v. Cone, 41 Oh St., 149,** the syllabus being as follows:

"1.   The principle of **respondeat superior** applies to municipal corporations, where the acts of their servants or agents refer to powers and duties ministerial in their nature and character.

2.   A city organized under the laws of Ohio, held the title to and the right of possession of a public cemetery located within its limits, which was under the management, control, and regulation of a board of cemetery trustees, chosen by the electors of the corporation and removable for cause by the city council—as provided in Chapt. XXVI, of an act, "To provide for the organization and government of municipal corporations,' passed May 7, 1869 (66 Ohio Laws, 149). An employee, while engaged in the cemetery in improving a vault owned by the city, was injured through the carelessness and want of skill of the superintendent of the cemetery and the negligence of the trustees. The employee worked under and obeyed the orders and directions of the superintendent, and both received their appointment from the board of trustees, subject

to the approval of the council. **Held:** That the city was liable for the injuries resulting to the employee."

In the last cited case, an interesting discussion may be found as to the dual capacity in which municipalities act under the laws of Ohio.

At p. 161, we find the following language used by the court:

"But within the sphere of their duties, municipal corporations are to be regarded in another and very different aspect. While they act in a public character or capacity, they may and do act also in a private capacity, like private corporations, and as such are held to a like responsibility. Thus, if a municipal corporation acquires real or personal property, and in the discharge of what may be deemed ministerial duties in respect to the same, an individual receives injury through the negligence of its officers or servants, it should be held responsible to that individual."

The pleadings do not present the issue of contributory negligence upon the part of plaintiff nor is there any evidence in the record which would have warranted the court in charging upon that issue. The donors of this park to the city expressly provided that the park is for the free use and enjoyment of the inhabitants of the City of Springfield. Plaintiff was, therefore, rightfully upon the premises in the absence of any rules of the golf commission prohibiting his presence at the place where he was injured and particularly in view of the fact that his presence there was at the express invitation of the park superintendent.

Under the evidence, the jury was amply warranted in finding that the park superintendent was negligent in attempting to re-light the Ruud automatic water heater without complying with the instructions relating thereto and that his negligence in that respect was the proximate cause of plaintiff's injuries. The amount of the verdict is not manifestly against the weight of the evidence.

We have carefully examined and considered all of the errors assigned and find none prejudicial to the rights of defendants. Substantial justice has been done by the verdict and judgment.

Judgment affirmed.

HORNBECK, P. J., and GEIGER, J., concur.