# ERNEST HEITMAN v. CITY OF LAKE CITY.[1]

November 28, 1947.

No. 34,503.

[1]Reported in 30 N. W. (2d) 18.

*Kenneth R. Smith, G. P. Mahoney,* and *John S. Morrison,* for appellant.

*William H. DeParcq, Donald T. Barbeau,* and *John R. Foley,* for respondent.

MATSON, JUSTICE.

Appeal from order denying defendant's blended motion for judgment *non obstante* or a new trial.

Plaintiff, as special administrator, brought this action to recover damages for the wrongful death of his minor son, seven years old, who died July 17, 1946, from drowning in a small boat harbor built and maintained by defendant on a triangular-shaped point of land jutting out into Lake Pepin. The base of the triangle is bounded by Park street, the northwesterly side by Greenwood street, and the southeasterly side by Centre street. The two latter streets converge at the apex of the triangle. Both Park and Centre streets are open to traffic, but Greenwood street is not. On the Greenwood street side, defendant has for many years maintained a municipal bathing beach, and on the Centre street side a tourist park with 26 cabins for rent. Prior to 1933, approximately in the center of the triangle, between the bathing beach and the tourist camp, there was a small pond connected with Lake Pepin by a channel large enough for the passage of small boats only. In 1934, defendant enlarged and dredged the pond and channel to an average normal water depth of 13 feet. The side of the excavation parallel to Park street was faced with a vertical retaining wall extending from the bottom of the excavation to about a foot above the ground level. This retaining wall, built of 8 x 16-inch timbers, is about 400 feet

long and 16 inches wide. Along the top of this wall, a fence 30 inches high was erected, which remained in place for about five or six years until destroyed by the ice. At the time of the accident and for several years prior thereto, the retaining wall was without a fence or a guardrail. In addition to its obvious purpose of maintaining a proper water depth by preventing the harbor embankment from caving in, the retaining wall served as a dock for the mooring of small boats. For a few years preceding the accident, the wall had not been repaired, and consequently the surface of the top timbers was spotted with dry-rot holes. The particular timber upon which plaintiff's son knelt when he fell into the water as he leaned forward to reach some floating object was also out of alignment with the rest of the wall and was inverted so that the edge next to the water was considerably higher than the landside edge. The water was approximately eight or nine feet deep next to the wall. In consideration of a rental paid to defendant, a small shack located on one end of the retaining wall was occupied by a man who sold soft drinks and operated a gasoline station and a private boat livery. A floating dock, equipped with 23 slips of various sizes for the accommodation of the larger boats, projected into the harbor from the southeasterly side. Boats could be moored to the retaining wall free of charge, but owners of boats desiring to use the floating dock were charged from $30 to $60 a year, depending on the size of the slip used. In addition to the shack rental and the floating-dock wharfage fees, the city collected rental for the use of tourist cabins. A small marine railway for removing boats from the water was available gratis. Boats not using the floating dock were permitted mooring space without charge.

■ From the antiquated maxim "the King can do no wrong" comes whatever immunity in tort is enjoyed by a municipality. In the judicial process, the principle of nonliability has been increasingly qualified by the distinction that, while the King can do no wrong as King, he can certainly commit wrongs as an individual so far as municipal corporations are concerned. Nonliability in tort for negligence is confined to acts performed in a sovereign or govern-

mental capacity, as distinguished from the liability attaching to acts which are performed by a municipality in its individual corporate or proprietary role. The principle of nonliability for governmental acts and liability for proprietary acts is easy to state but difficult to apply. When is the act governmental, and when is it proprietary? We have evolved no catchall test equally applicable to all situations. We have, however, come to recognize certain characteristics as indicative of the proprietary role. In Storti v. Town of Fayal, 194 Minn. 628, 632, 261 N. W. 463, 465, we adopted the rule of Bolster v. City of Lawrence, 225 Mass. 387, 390, 114 N. E. 722, 724, L. R. A. 1917B, 1285, wherein the Massachusetts court said:

"* * * The underlying test is whether the act is for the common good of all without the element of special corporate benefit *or* pecuniary profit. If it is, there is no liability; if it is not, there *may* be liability."[2] (Italics supplied.)

In the instant case, it is clear that the boat harbor was of primary service only to those inhabitants who owned boats and elected to moor them in this port for convenience and safety, and not to the public as a whole, as in the case of a public park. It was for the protection of their private property. Aside from the substantial charges made for the use of the floating dock, it is obvious that the enterprise as a whole involved an element of special corporate benefit, in that the harbor was used in part as a device for attracting to the city nonresident boat owners, who by their patronage of local business institutions contributed to the financial prosperity of the community. Gorsuch v. City of Springfield, 43 Ohio L. Abs. 83, 61 N. E. (2d) 898. As in the Storti case, *supra,* we here have an enterprise that was not equally for the common good of all without special corporate benefit.

The proprietary nature of the undertaking is confirmed by the decisions of other jurisdictions with respect to analogous situations.

---

[2]See, 26 Minn. L. Rev. 334-343; 38 Am. Jur., Municipal Corporations, § 574; Harper, Law of Torts, § 295.

This small boat harbor with its docking facilities is closely analogous to, if not practically identical with, wharves operated by municipalities in various sections of our country. The essential nature of a landing or mooring place for boats is the same, whether it be called a dock, pier, wharf, or a small boat harbor. By the overwhelming weight of authority, wherever a municipality has engaged in the operation of a wharf, it has been held to be a proprietary function.[3]

Closely analogous to the operation of a boat harbor is that of a municipal airport. In Coleman v. City of Oakland, 110 Cal. App. 715, 720, 295 P. 59, 61, the court said:

"We have no hesitancy in deciding that in the conduct of an air port the municipality is acting in a proprietary capacity. An air port falls naturally into the same classification as such public utilities as electric light, gas, water, and transportation systems, which are universally classed as proprietary. Its nearest analogy is perhaps found in docks and wharves. 'An airport with its beacons, landing fields, runways, and hangars is analogous to a harbor with its lights, wharves and docks; the one is a landing place and haven of ships that navigate the water, the other of those that navigate the air.' (Dysart v. St. Louis, 321 Mo. 514 [62 A. L. R. 762, 11 S. W. (2d) 1045].)"

The operation of a municipal airport has been widely recognized as a proprietary undertaking.[4]

---

[3]Gregg v. King County, 80 Wash. 196, 141 P. 340, Ann. Cas. 1916C, 135; Harris v. City of Bremerton, 85 Wash. 64, 147 P. 638, Ann. Cas. 1916C, 160; City of Petersburg v. Applegarth's adm'r, 69 Va. (28 Gratt.) 321, 26 Am. R. 357; Annotations, 108 A. S. R. 172, 61 L. R. A. 953, Ann. Cas. 1916C, 153; 28 R. C. L., Wharves, § 29. See, Hoppe v. City of Winona, 113 Minn. 252, 259, 129 N. W. 577, 580, 33 L.R.A.(N.S.) 449, Ann. Cas. 1912A, 247.

[4]Dysart v. City of St. Louis, 321 Mo. 514, 11 S. W. (2d) 1045, 62 A. L. R. 762; City of Mobile v. Lartigue, 23 Ala. App. 479, 127 So. 257; City of Blackwell v. Lee, 178 Okl. 338, 62 P. (2d) 1219; Mollencop v. City of Salem, 139 Or. 137, 8 P. (2d) 783; Peavey v. City of Miami, 146 Fla. 629, 1 So. (2d) 614; Christopher v. City of El Paso (Tex. Civ. App.) 98 S. W. (2d) 394.

122

■ The verdict is sustained by the evidence. The boat harbor was located in the center of a well-established recreational area, where children, as well as adults, habitually came to play, swim, picnic, and fish. On one side was the tourist park, and on the other the bathing beach, which naturally brought an influx of children. The harbor with its many boats was a fascinating place for any child. As an additional attraction, soft drinks could be bought on the premises. Aside from all these considerations, the retaining wall, an integral and essential part of defendant's proprietary undertaking, was in itself attractive to children. There was ample evidence to sustain a finding that children were frequently seen playing on the wall, a structure which was only 16 inches wide and which constituted the sheer and precipitous side of a drop off into eight or nine feet of water. It was an enticing and treacherous perch for a child eagerly reaching outward over the dangerously deep water to retrieve or play with floating objects. Dry rot and water seepage, as well as the fact that the top surface of one of the timbers was inverted, added to the peril for unwary and pleasure-bent youngsters who might lose their balance. It constituted a place of obvious danger at a focal point of activity alluring to children. Unlike the situation in Barrett v. Village of Princeton, 135 Minn. 56, 160 N. W. 190, which involved a temporary source of danger that was left unguarded for only a few hours, we have here a condition constituting a source of peril which continued throughout the entire summer and from year to year. In fact, no guardrail or fence had been maintained for several years. The jury could justifiably find that defendant knew, or should have known, of the frequent use of the retaining wall by children of tender years and that an occasional warning by the harbor master did not constitute the exercise of a sufficient degree of care under all the circumstances. We, as well as other courts, have frequently commented upon the high degree of vigilance necessary to constitute ordinary care where children may reasonably be expected to be present. Schmit v. Village of Cold Spring, 216 Minn. 465, 13 N. W. (2d) 382, 154 A. L. R. 1325. The degree of care required is to be measured in the light of the child's

age with respect to all the surrounding circumstances. The greater the hazard the greater the care required. Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 261 N. W. 194; 38 Am. Jur., Negligence, §§ 37 and 40. Although this court no longer recognizes a distinction between "attractive nuisance" cases and other negligence cases, it does recognize the diligence required when attractive or alluring instrumentalities are placed where children are known habitually to play. Schmit v. Village of Cold Spring, 216 Minn. 467, 13 N. W. (2d) 384, 154 A. L. R. 1325.

"* * * Children, through childish inattention, may fail to observe conditions which an adult might reasonably be expected to discover. Even if they know of the condition, there may be risks which it is not reasonable to assume that children will appreciate. In such case, the possessor does not perform his duty by merely calling the condition to the attention of the children licensees." Restatement, Torts, § 342, *comment b*.

Defendant owed plaintiff's decedent the duty of keeping the premises reasonably safe. As a member of the public, the child had a right to frequent the surrounding recreational area. In occupying the retaining wall for the purpose of play, he may have committed a technical trespass, but whether any element of trespass is present is of little consequence. When defendant's duty of reasonable care once arose, the degree of care required was, in any event, obviously not less than that owing to a trespassing child with respect to an alluring instrumentality. See, Znidersich v. Minnesota Utilities Co. 155 Minn. 293, 193 N. W. 449; Schmit v. Village of Cold Spring, 216 Minn. 465, 13 N. W. (2d) 382, 154 A. L. R. 1325. In Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 536, 261 N. W. 194, 196, we adopted the rule of Restatement, Torts, § 339, to the effect that:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

Surely the utility, if any, to defendant of maintaining the retaining wall without a fence or guardrail was slight as compared with the risk to a child of tender years. The issue as to defendant's negligence was properly left to the jury.

We find no merit in defendant's contention that its negligence was not a proximate cause of the accident. Whether plaintiff's decedent fell into the water because he slipped as a result of the wet and muddy condition of the wall or merely because he lost his balance in attempting to reach a floating object is immaterial. In either event, the proximate cause was the negligence of the city in not properly safeguarding a narrow and precipitous causeway, frequented by children, where any unwary child might lose his balance and plunge into water of a dangerous depth. "If from the negligence an injury flows in unbroken sequence as a natural and probable consequence, liability follows." Schmit v. Village of Cold Spring, 216 Minn. 468, 13 N. W. (2d) 384, 154 A. L. R. 1325.

The jury awarded plaintiff a verdict of $5,250, and of this sum $372.50 was for special damages. The child was in good health. The parents are the sole beneficiaries. Defendant contends that the verdict is excessive with respect to the death of a child of seven years, in the light of the fact that the legislature has seen fit to allow a maximum recovery of only $10,000 in wrongful-death cases. Obviously, the $10,000 recovery ceiling in the wrongful-death stat-

ute is not a yardstick for the measurement of damages, but merely a limitation upon the amount that may be recovered. In assessing the amount of damages, it is permissible for the jury to consider the present low value of money and the high cost of living. Ranum v. Swenson, 220 Minn. 170, 19 N. W. (2d) 327; Kerzie v. Rodine, 216 Minn. 44, 11 N. W. (2d) 771; Bergstrom v. Frank, 213 Minn. 9, 4 N. W. (2d) 620. Under all the circumstances here existing, we cannot say that the verdict was excessive.

The order of the trial court is affirmed.

Affirmed.